949 A.2d 820

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT.
v. DIARA BARDEN, DEFENDANT–APPELLANT.

Argued February 19, 2008—Decided June 24, 2008.

376

*Alison S. Perrone*, Designated Counsel, argued the cause for appellant (*Yvonne Smith Segars*, Public Defender, attorney; *Ms. Perrone* and *Julie A. Higgs*, Designated Counsel, on the briefs).

■■■■■■■■■■■■■■■■

*Natalie A. Schmid Drummond,* Deputy Attorney General, argued the cause for respondent (*Anne Milgram,* Attorney General of New Jersey, attorney).

Justice WALLACE, JR., delivered the opinion of the court.

In this case, the trial court admitted evidence that defendant sold drugs to co-defendant over a six-month period prior to the robbery under a theory of *res gestae.* On appeal, the Appellate Division affirmed, but held that the other-crimes evidence was properly admitted under *N.J.R.E.* 404(b) to show defendant's motive with respect to the crimes charged and that the corresponding limiting instruction was appropriate. We granted certification "limited solely to the question of whether testimony that defendant sold drugs to the co-defendant over a six-month period prior to the robbery of September 7, 2003, was improperly admitted by the trial court under either a theory of *res gestae* or *N.J.R.E.* 404(b)." We now reverse. We conclude that the evidence that defendant sold drugs to the co-defendant over a six-month period was evidence of other crimes that was unduly prejudicial and should have been excluded.

## I.

### A.

The State presented the following evidence at trial. Sixteen-year-old Andrea Gendron was addicted to crack cocaine since mid–2003. She supported her drug habit by means of prostitution, theft, and burglary. Gendron purchased crack cocaine from defendant Diara Barden on approximately thirty occasions for six months prior to September 2003.

On Sunday, September 7, 2003, Gendron asked defendant to give her some crack cocaine and promised to pay him later because she had no money. Defendant declined but suggested that they rob one of Gendron's clients. Gendron agreed and selected Robert Brown as the victim because he kept money in a

safe in his bedroom. She also told defendant that Robert's brother, Randall Brown, lived in the same house.

Gendron called Robert and received permission to come see him. Defendant then drove Gendron to Robert's house in a burgundy Mustang, but before going there they stopped at a house on Olden Avenue where defendant retrieved a handgun. Gendron and defendant arrived at Robert's house around 9:30 p.m. Prior to entering the house, the two agreed that they would tell Robert that defendant was Gendron's bodyguard and was there to protect her. When they knocked on the door, Robert refused to allow defendant to enter with Gendron. Defendant returned to his car while Robert and Gendron went upstairs to a bedroom. Soon thereafter, Gendron heard defendant beeping the car horn. She excused herself from Robert and left the house to go talk to defendant. Several minutes later, Gendron returned to the house with defendant. When they were inside, Robert approached them and asked defendant to leave. As he escorted defendant to the door, defendant drew a handgun and demanded that Robert call his brother who was also in the house. Defendant and Robert then walked to the kitchen where Robert yelled for Randall. Defendant was distracted when Randall entered the room, allowing Robert the opportunity to grab defendant's wrist.

Randall joined the struggle as defendant continued to hold the handgun. Defendant yelled for Gendron to stab Robert. Gendron grabbed a pot instead and began hitting Randall on the head. The struggle shifted to the dining room where Robert forced defendant to drop the handgun outside the screened window. Defendant was able to break free and fled from the house with Gendron.

Robert's neighbor, Tom Sliwinski, overheard the commotion and called the police. When the police arrived, Robert outlined what occurred and gave the police a description of defendant and Gendron. Defendant was eventually apprehended and charged with robbery.

B.

At trial, defendant presented a different picture of the incident. In addition to his own testimony, he offered the testimony of Towanna Stephens, his cousin; Peggy Barden, his grandmother; Brett Barden, his uncle; and Theresa Jones, Robert's neighbor.

Defendant testified that on the night of September 7, 2003, he, Towanna, Peggy, Brett, and other family members were sitting outside of Peggy's house in Trenton, when they observed a young, white girl who did not live in the neighborhood walking up and down the street, looking lost and confused. After about ten minutes, the girl, later identified as Gendron, approached Peggy's house and asked Brett to give her a ride.

At first Brett agreed to do so. However, after receiving a cell phone call from his girlfriend asking him to pick her up, Brett asked defendant to give the girl a ride. Defendant said he hesitated, but his grandmother persuaded him to do it. Defendant and Gendron departed in a maroon Mustang and drove to 219 Homecrest Avenue in Ewing. When they arrived at the house, Gendron asked him to wait outside while she went inside. Defendant agreed. After about ten minutes, he began blowing the horn to tell Gendron to hurry. At that point, Theresa came outside and asked him to stop beeping the horn.

Defendant said that Gendron came to the front door and motioned for him to come inside. He entered the house and told Gendron he was leaving. At that point, Robert came downstairs and yelled at defendant for being in his home. The two exchanged insults that led to a verbal altercation. Defendant turned to leave when Robert struck him in the head. Defendant fought back but another man joined in the fight. Defendant testified that it was Robert who displayed a handgun during the fight. At some point during the struggle, they crashed into a window and Robert dropped the handgun outside. Defendant was able to flee from the house, and he drove away with Gendron. Defendant claimed he never saw Gendron before that day and denied having a handgun. Defendant also denied discussing with Gendron the

idea of committing a robbery, and that he made a statement to the police about the incident.

## C.

The State called Detective Holt to rebut much of defendant's testimony. Detective Holt testified that defendant came to the police station on September 12, 2003. He administered *Miranda*[1] warnings to defendant, and defendant waived his right to remain silent. After explaining that Gendron had been identified as a suspect of a robbery on Homecrest Avenue, Detective Holt asked defendant if he knew anything about the case. Defendant was silent for about thirty minutes before Detective Holt asked defendant where he was the previous Sunday. Defendant replied that he had traveled to Maryland for a few days and returned on Sunday. When Detective Holt told defendant that the police recovered a handgun and intended to check it for fingerprints, defendant again fell silent for about twenty minutes before asking what would happen if he told him what occurred that day. Detective Holt replied that he could not make defendant any promises. Defendant then told Detective Holt that he drove to a house with Gendron to see "some guy" and while inside, the man's brother came out of the kitchen with a handgun. Defendant indicated that a fight broke out and the handgun fell out the window. A short while later, he and Gendron fled from the house. Detective Holt testified that defendant indicated he did not want to say anything else and the questioning stopped.

The State sought to read a statement that Detective Holt had obtained from Sliwinski, Robert's neighbor, because he was on military duty in Iraq at the time of the trial, and defendant consented. In the statement, Sliwinski outlined that he heard an argument at Robert's house, went outside to investigate, looked into the dining room window, and saw the two Brown brothers fighting a black man. Sliwinski ran home to call the police. He

---

[1] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

was on the phone when he heard either Robert or Randall yell, "He has a gun." A few seconds later, Sliwinski saw a handgun fall from the window to the ground. Sliwinski walked over and picked up the handgun before he walked to the front of his house where he saw a black male and a petite, white female run from Robert's home and drive away in a Mustang.

## D.

The jury found defendant guilty of first-degree robbery, second-degree attempted theft, fourth-degree aggravated assault, third-degree unlawful possession of a weapon, and second-degree possession of a weapon for an unlawful purpose. The jury found defendant not guilty of second-degree burglary. After merger, the trial court imposed a sentence of fifteen years with an eighty-five percent parole disqualifier for the first-degree robbery offense and a concurrent four-year term for the unlawful-possession-of-a-weapon offense.

On appeal, the Appellate Division affirmed in an unpublished opinion. The panel applied the test outlined in *State v. Cofield*, 127 *N.J.* 328, 338, 605 *A.*2d 230 (1992), to assess the admissibility of other crimes evidence under *N.J.R.E.* 404(b), and found no error in the admission of testimony that defendant sold drugs to Gendron thirty times during the six months prior to the charged offense. The panel concluded that the evidence of other crimes was properly admitted to demonstrate the reason why defendant participated in the robbery and how the scheme to steal from Robert arose from defendant's refusal to "loan" drugs to Gendron. The panel did not address defendant's contention that the evidence was improperly admitted as *res gestae*. We granted defendant's petition for certification. *State v. Barden*, 192 *N.J.* 75, 926 *A.*2d 858 (2007).

## II.

Defendant argues that Gendron's testimony that he sold drugs to her during the six months prior to the date of the offense was

not admissible either as evidence of other crimes under *N.J.R.E.* 404(b) or under a theory of res gestae. He contends that the evidence did not satisfy the *Cofield* test for admission under *N.J.R.E.* 404(b) because the evidence was not relevant to any material issue, but that even if it were relevant, its probative value was outweighed by the prejudice to him. He urges that if the evidence is deemed relevant and material, at a minimum, the evidence must be sanitized by eliminating the prior drug sales and permitting Gendron to testify that she knew defendant for six months before the robbery, and that defendant was aware of her drug addiction from seeing her around the neighborhood. He urges that the holding of the Appellate Division that the evidence was admissible to demonstrate his intent and motive for the scheme to steal from the victim would serve to invite the jury to find that defendant must have acted in conformity with his propensity for committing crimes. He suggests that we follow *State v. Hernandez*, 170 *N.J.* 106, 784 *A.*2d 1225 (2001), and hold that evidence of the prior sales "smacks of prohibited propensity evidence" that was more prejudicial than probative. Defendant adds that even if the evidence was properly admitted under *N.J.R.E.* 404(b), it was error not to instruct the jury that the evidence was limited solely to show intent. Further, defendant contends that the trial court erred in admitting the evidence under a *res gestae* theory when the alleged transactions occurred up to six months before the robbery, were factually separate from the robbery, and were not necessary for the jury to understand the circumstances of the robbery.

In contrast, the State argues that the evidence of the prior drug transactions was admissible under *N.J.R.E.* 404(b) because that evidence was essential to establish defendant's motive and intent for committing the charged offense. The State contends that the *Cofield* test was satisfied and the trial court properly instructed the jury as to its prohibited and permissible uses. Additionally, the State argues that the trial court properly admitted the evidence of prior drugs sales as *res gestae* because it was part and parcel of the offenses tried and gave context for the crime. The

State contends that the res gestae concept covers not just conduct that occurs at the same time as the charged crimes, but also conduct that may occur at different times and in different places.

## III.

### A.

On numerous occasions we have stated the principles applicable to the admission of evidence of other crimes under *N.J.R.E.* 404(b). *State v. Kemp,* 195 *N.J.* 136, 948 *A.*2d 636 (2008); *State v. Lykes,* 192 *N.J.* 519, 534–37, 933 *A.*2d 1274 (2007); *State v. Williams,* 190 *N.J.* 114, 122, 919 *A.*2d 90 (2007); *State v. Jenkins,* 178 *N.J.* 347, 365, 840 *A.*2d 242 (2004); *State v. G.V.,* 162 *N.J.* 252, 256–58, 744 *A.*2d 137 (2000); *State v. Marrero,* 148 *N.J.* 469, 490– 92, 691 *A.*2d 293 (1997); *State v. Cofield, supra,* 127 *N.J.* at 331– 38, 605 *A.*2d 230. *N.J.R.E.* 404(b), which governs the admissibility of evidence of other crimes, was formerly *Evidence Rule* 55. Thus, any reference in earlier cases to *Evidence Rule* 55 would influence our determination under present *N.J.R.E.* 404(b).

*N.J.R.E.* 404(b) provides that:

Evidence of other crimes, wrongs or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

The Rule seeks to strike a balance between the prejudice to a defendant that is inherent in other-crimes evidence and the recognition that the evidence may be highly relevant to prove a defendant's guilt of the crime charged. If the "other crime evidence [is] offered solely to prove criminal disposition [it] is excluded under the Rule." *State v. Stevens,* 115 *N.J.* 289, 300, 558 *A.*2d 833 (1989). However, if that evidence is offered to prove other facts in issue such as motive, opportunity, intent, prepara- tion, plan, knowledge, identity, or absence of mistake or accident, it may be admissible subject to a weighing of the probative value against its apparent prejudice. *Ibid.*

In *Cofield, supra,* the Court articulated a four-part test designed to guide the determination of when to admit such evidence. 127 *N.J.* at 338, 605 *A.*2d 230. The Court defined the four-part test as follows:

1. The evidence of the other crime must be admissible as relevant to a material issue;

2. It must be similar in kind and reasonably close in time to the offense charged;

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[*Ibid.*]

Recently, we noted that the second prong may be eliminated where it "serves no beneficial purpose." *Williams, supra,* 190 *N.J.* at 131, 919 *A.*2d 90. We explained that the "usefulness [of *Cofield's* second prong] as a requirement is limited to cases that replicate the circumstances in *Cofield,*" in which evidence of drug possession that occurred subsequent to the drug incident that was the subject of the prosecution was relevant to prove possession of the drugs in the charged offense. *Ibid.* Thus, in *Williams,* where the other-crimes evidence was relevant only to the defendant's state of mind, and in other similar instances, the test became a three-part test by elimination of the similar-in-kind prong. *Ibid.*

The fourth prong, whether the probative value of the evidence is outweighed by its apparent prejudice, is generally the most difficult part of the test. Because of the damaging nature of such evidence, the trial court must engage in a "careful and pragmatic evaluation" of the evidence to determine whether the probative worth of the evidence is outweighed by its potential for undue prejudice. *Id.* at 303, 919 *A.*2d 90. In the weighing process, the court should also "consider the availability of other evidence that can be used to prove the same point." *Jenkins, supra,* 178 *N.J.* at 365, 840 *A.*2d 242 (citation and quotation omitted).

The trial judge should be careful to exclude other torts or crimes evidence, even though it is independently relevant, wherever he can reasonably do so without damaging the plaintiff's or prosecutor's case. For example, if the prosecutor has adequate proof of identity, or of motive and the like, he should not be permitted to

use the highly inflammatory evidence of other crimes to establish those facts. In a forgery case where authorship of the allegedly forged writing is in issue, the trial judge, for instance, should not admit standards indicating the defendant's guilt of other forgeries if neutral standards of the defendant's handwriting are available to the prosecutor.

[*Stevens, supra,* 115 *N.J.* at 303, 558 *A.*2d 833 (citation and quotation omitted).]

In an effort to reduce the inherent prejudice in the admission of other-crimes evidence, our courts require the trial court to sanitize the evidence when appropriate. *State v. Collier,* 316 *N.J.Super.* 181, 185, 719 *A.*2d 1276 (App.Div.1998), *aff'd o.b.,* 162 *N.J.* 27, 738 *A.*2d 369 (1999). In *Collier,* the court explained "[t]hat sanitizing accommodates the right of the proponent to present relevant evidence and the right of the objecting party to avoid undue prejudice." *Id.* at 195, 719 *A.*2d 1276; *see State v. Brown,* 180 *N.J.* 572, 584, 853 *A.*2d 260 (2004) (finding "that any potential for prejudice can be ameliorated by the sanitization of the predicate offense"); *State v. Fortin,* 318 *N.J.Super.* 577, 598, 724 *A.*2d 818 (App.Div.1999) (noting that "at trial the judge must 'sanitize' the other-crime evidence by confining its admissibility to those facts reasonably necessary for the probative purpose of 'identity' "), *aff'd,* 162 *N.J.* 517, 745 *A.*2d 509 (2000).

If the trial court determines that the evidence of other crimes is admissible, in addition to sanitizing the evidence when appropriate, the court must carefully instruct the jury as to its limited use. "[T]he court's instruction 'should be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere.' " *Fortin, supra,* 162 *N.J.* at 534, 745 *A.*2d 509 (quoting *Stevens, supra,* 115 *N.J.* at 304, 558 *A.*2d 833). The instruction should be given when the evidence is presented and in the final charge to the jury. *Id.* at 534–35, 745 *A.*2d 509.

In our review of a trial court's determination on the admissibility of the evidence of other crimes under *N.J.R.E.* 404(b), we give great deference to the decision of the trial court.

*Lykes, supra,* 192 *N.J.* at 534, 933 *A.*2d 1274. "Only where there is a clear error of judgment should the trial court's conclusion with respect to that balancing test be disturbed." *Marrero, supra,* 148 *N.J.* at 483, 691 *A.*2d 293 (citation and quotation omitted). However, when a trial court does not analyze the admissibility of other-crimes evidence under *Cofield,* we may conduct a plenary review to determine its admissibility. *Lykes, supra,* 192 *N.J.* at 534, 933 *A.*2d 1274.

### B.

We turn now to apply the above principles to the present case. At trial, the trial court conducted a hearing out of the presence of the jury to determine the admissibility of Gendron's testimony that during the six months prior to the robbery she purchased crack cocaine from defendant on approximately thirty occasions; that defendant knew she was addicted to crack cocaine; that her relationship with defendant was based solely on the purchase of drugs; and that on the date of the alleged crimes, the two of them agreed to rob Robert to acquire money for Gendron to purchase drugs from defendant.

In performing its gate-keeping function, the trial court found that the evidence was relevant to show defendant's intent and motive to commit an armed robbery. Further, the court found the evidence of the other crimes was shown by clear and convincing evidence, and that its probative value outweighed any prejudicial effect. However, because the evidence was not similar in kind to the crimes charged to satisfy the second prong of *Cofield,* the trial court decided not to admit the evidence under *Rule* 404(b), but found it admissible under a *res gestae* theory.

As previously suggested, the second prong of *Cofield* is not applicable in every case and its "usefulness as a requirement is limited to cases that replicate the circumstances in *Cofield.*" *Williams, supra,* 190 *N.J.* at 131, 919 *A.*2d 90. Here, we agree with the Appellate Division that under the circumstances present-

ed, the second prong of the test served no beneficial purpose and should not have been considered.

 The fourth prong, whether the prejudicial effect of the evidence outweighs its probative value, requires a careful weighing of competing interests. *Stevens, supra,* 115 *N.J.* at 303, 558 *A.*2d 833. If other less prejudicial evidence may be presented to establish the same issue, the balance in the weighing process will tip in favor of exclusion. *Jenkins, supra,* 178 *N.J.* at 365, 840 *A.*2d 242.

 The evidence that defendant and Gendron planned the robbery so Gendron could obtain money to purchase drugs and that Gendron and defendant had known one another for some time was relevant and admissible. However, the testimony of six months of drug transactions between defendant and Gendron was not needed to show the motive and intent for the robbery. Rather, that could have been established by testimony regarding Gendron's drug addiction; that she sought drugs on the day of the robbery; and that she and defendant planned the robbery to obtain money to purchase drugs. Indeed, Gendron could have testified that she knew defendant for six months prior to the robbery and that defendant was aware of her drug addiction from seeing her around the neighborhood.

Consistent with the view we expressed in *Hernandez, supra,* we find that the evidence that for six months prior to the offense defendant sold drugs to Gendron more than thirty times was unduly prejudicial and "smack[ed] of prohibited propensity evidence." 170 *N.J.* at 130, 784 *A.*2d 1225 (noting that evidence defendant sold drugs twenty times during two months prior to arrest was extremely prejudicial and "smacks of prohibited propensity evidence"). The risk was too high that the jury could conclude that because defendant was involved in numerous prior drug sales, he was prone to criminal activity in general. We conclude that the probative value of testimony of six months of prior drug sales was outweighed by its prejudicial effect and the evidence should have been excluded.

## C.

In addition, we do not find that the trial court's limiting instruction on the admission of the other-crimes evidence was sufficient to eliminate the prejudice to defendant. Although the trial court admitted the evidence as *res gestae*, and not other-crimes evidence, the court also gave a limiting instruction. The trial court instructed the jury on the limited use of the evidence both at the time the evidence was admitted and in the final charge to the jury. Immediately following Gendron's testimony that she bought drugs from defendant for six months, the trial court instructed the jury on the following:

> You've heard testimony from this witness that she had a drugs-for-money relationship with the defendant, Mr. Barden. Of course, it's for you to weigh her credibility and determine whether that was so. But the Court cautions you about this: Even if you were to find that it was so, you may not conclude that simply because of that relationship, that is, that Mr. Barden was dealing drugs, that he is, therefore, guilty of the offenses charged in the indictment.
>
> This court has allowed this testimony for the reason that it will enable you to understand the circumstances under which all of this allegedly transpired. But again, you may not conclude, even if you find that Mr. Barden was dealing drugs, that he is, therefore, guilty of this offense. They are separate matters and are to be decided separately.

Later, at the close of trial, the court instructed the jury

> Evidence has been presented that the defendant, Mr. Barden, had, previously to September 7, 2003, engaged in drug transactions with Andrea Gendron. Normally, evidence that a defendant was involved in other criminal activity is not admissible because it has the tendency to suggest that the defendant must, therefore, be guilty of the crimes charged in the present indictment.
>
> Here, the court permitted testimony that the defendant was involved in prior drug transactions with Andrea Gendron so that you may understand the circumstances under which Andrea Gendron acted. Of course, it is for you, and not the court, to determine whether Andrea Gendron's testimony is credible in the first place. All that the Court has done is to allow you to hear the testimony, but it does so with the strict admonition that if you find that evidence to be credible, you may not consider it for any other purpose other than to explain Andrea Gendron's conduct on September 7th, 2003. You may not, even if you find it to be credible, find the defendant guilty simply because you are convinced that he previously was involved in a drug transaction with Andrea Gendron.

Despite the trial court's diligence in giving limiting instructions to the jury both at the time of the admission of the

other-crimes evidence and in the final charge, we find that the instructions were incomplete. "A carefully crafted limiting instruction must explain to the jury the limited purpose for which the other-crime evidence is being offered." *Hernandez, supra,* 170 *N.J.* at 131, 784 *A.*2d 1225. That is, the court must clearly "explain precisely the permitted and prohibited purposes of the evidence with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere." *Cofield, supra,* 127 *N.J.* at 341, 605 *A.*2d 230. Although the court explained that the jury could not use the evidence that defendant committed prior drug deals to simply find him guilty for that reason, and that the evidence could be used to explain the circumstances under which Gendron acted, the charge failed to "focus the jury precisely on the permissible uses of the other-crime evidence in the context of the facts of this case and those issues genuinely in dispute." *Hernandez, supra,* 170 *N.J.* at 132, 784 *A.*2d 1225. That is, the jury charge should have informed the jury that the evidence was limited solely to establish defendant's motive and intent.

Because defense counsel did not object to the court's instruction, we consider the error under the plain error rule. *R.* 2:10-2. Plain error is reversible if it is "clearly capable of producing an unjust result." *R.* 2:10-2. The test is whether the possibility of injustice is sufficient "to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." *State v. Macon,* 57 *N.J.* 325, 336, 273 *A.*2d 1 (1971). However, an erroneous charge will rarely stand on the ground that the error was harmless. *State v. Weeks,* 107 *N.J.* 396, 410, 526 *A.*2d 1077 (1987).

As we noted above, it was error to admit the evidence of other crimes. "The likelihood of prejudice is acute when the proffered evidence is proof of a defendant's uncharged misconduct." *Stevens, supra,* 115 *N.J.* at 302, 558 *A.*2d 833 (citations omitted). In combination with the error in the admission of the other-crimes evidence and the shortcomings in the jury charge, we

find a "reasonable doubt whether the error led the jury to a result it otherwise might not have reached." *Macon, supra,* 57 *N.J.* at 336, 273 *A.*2d 1; *see R.* 2:10–2.

## IV.

The State also argues that Gendron's testimony that defendant sold her drugs on numerous occasions prior to the day of the robbery was admissible as *res gestae.* Defendant not only argues against the admissibility of the evidence as *res gestae,* but urges that the Court should no longer apply the concept.

We noted in *State v. Long,* 173 *N.J.* 138, 153, 801 *A.*2d 221 (2007), that "the ancient *res gestae* concept has been used to admit a wide variety of evidence in both the criminal and civil context under circumstances that are now codified as hearsay exceptions in the *New Jersey Rules of Evidence.*" (emphasis added). Further, we also explained that "[d]espite the urging of some to abandon the use of the principle denominated as *res gestae,* . . . courts continue to cling to it." *Ibid.* In a concurrence, Chief Justice Poritz pointed out that "although the *res gestae* principle, standing alone, has been discredited by scholars as a basis to admit otherwise inadmissible evidence, where, as here, its use is tethered to specific *Evidence Rules,* it remains a useful interpretive tool." *Id.* at 166, 801 *A.*2d 221 (Poritz, C.J., concurring) (emphasis added). In his concurrence/dissent, Justice Stein urged that the Court eliminate the concept of *res gestae* because "the principles that historically have comprised the *res gestae* exception have been codified, but without use of the words *'res gestae.'* " *Id.* at 169, 801 *A.*2d 221 (Stein, J., concurring in part, dissenting in part). Justice Stein was of the view that

> the *res gestae* concept has been superseded by four separate hearsay exceptions: present sense impressions, excited utterances, present bodily conditions, and present mental states and emotions. Because those principles have been codified by specific exceptions, the Court would be better served by abandoning continued reference to the phrase *res gestae* and replacing it with the precise analysis contemplated by our *Rules of Evidence.*
>
> [*Id.* at 170, 801 *A.*2d 221 (emphasis added).]

We need not decide the debate whether *res gestae* should remain a viable concept in our jurisprudence. We are convinced that even if *res gestae* remains a viable theory, it should not have formed the basis for the admission of evidence that Gendron had purchased drugs from defendant over the past six months. That highly prejudicial evidence was simply not needed to establish defendant's motive and intent. *See Kemp, supra,* 195 *N.J.* at 162, 948 *A.*2d 636.

## V.

The judgment of the Appellate Division is reversed and the matter is remanded for a new trial.

Justice ALBIN, concurring.

I fully concur with the majority's opinion, but add these few words. For the reasons I expressed in *State v. Kemp,* 195 *N.J.* 136, 157–63, 948 *A.*2d 636 (2008) (Albin, J., concurring), I believe that the time has come for this Court to abandon the discredited doctrine of res gestae as an independent basis for the admission of evidence. I look forward to the Court addressing whether res gestae has any continuing relevance in our evidence law when the issue is squarely before us.

Justice LONG joins in this opinion.

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVER-SOTO and HOENS—7.

*For concurrance*—Justices LONG and ALBIN—2.