**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1883-20

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

RUSSELL B. STEVENS, a/k/a
RUSSELL B. STEVENS, 4TH,
and RUSSELL B. STEVENS IV,

    Defendant-Respondent.

_____

Argued June 2, 2022 – Decided August 1, 2022

Before Judges Gilson and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 18-10-1329.

Michael Denny, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Michael Denny, of counsel and on the brief).

Alexis R. Agre, Special Deputy Attorney General/ Acting Assistant Prosecutor, argued the cause for respondent (LaChia L. Bradshaw, Acting Burlington

County Prosecutor, attorney for respondent; Alexis R. Agre, of counsel and on the brief).

PER CURIAM

On October 11, 2018, a Burlington County grand jury returned a three-count indictment charging defendant with second-degree disarming a law enforcement officer, N.J.S.A. 2C:12-11(a) (count one); fourth-degree aggravated assault on a law enforcement officer, N.J.S.A. 2C:12-1(b)(5)(a) (count two); and third-degree resisting arrest, N.J.S.A. 2C:29-2(a)(3) (count three). The charges stemmed from an encounter during which police responded to defendant's home after a 9-1-1 call reporting defendant's attempted suicide.

In November 2019, defendant proceeded to trial before a jury. At the close of the State's case, the trial judge granted defendant's motion for judgment of acquittal on count three pursuant to Rule 3:18-1. Thereafter, the jury convicted defendant of counts one and two. At sentencing, the judge found that the presumption of imprisonment for a second-degree crime was overcome, see N.J.S.A. 2C:44-1(d), due, in large part, to defendant's mental health history. As a result, the judge sentenced defendant to two years' probation on count one, and a concurrent two-year probationary term on count two. Defendant now appeals his convictions memorialized in an amended judgment of conviction entered on June 9, 2020. For the reasons that follow, we reverse.

# I.

We summarize the salient facts elicited during a three-day trial conducted on November 14, 19, and 20, 2019. At the trial, the State produced two witnesses, Maple Shade Police Department Sergeants William Turner, III, and Brian Weiss.

Sergeant Turner testified that just before midnight on August 17, 2017, he responded to a 9-1-1 call from a residence in Maple Shade Township reporting an "intoxicated" male, later identified as defendant, "covered . . . in gasoline" and "threatening to set himself on fire." When Turner arrived on the scene, he encountered defendant's sister, Rosemarie Nye, outside the residence. Nye informed Turner that earlier that evening, she and defendant "had been at a Jimmy Buffet concert," and there had been "an altercation . . . where [defendant] had pulled a knife . . . on one of his friends and was ejected from the concert." "The knife was taken away" and defendant and his sister left the concert.

Nye explained that on the drive home, defendant "thr[e]w himself from the moving vehicle" but Nye was able to coax defendant back into the vehicle. Once they arrived home, defendant, in an agitated state, "emptied his belongings from the car, . . . dumped a container of gasoline on himself and said . . . I'm

3 <span>A-1883-20</span>

going to burn in [H]ell." According to Nye, at some point, defendant changed his mind and went inside the residence to take a shower.

Turner testified that after he had confirmed that defendant was still inside taking a shower, Turner went into the house "to check on [defendant's] well-being." Turner intended to ascertain whether defendant was "suicidal" and in need of "crisis intervention." Upon entering the home, Turner went to the bathroom where "[t]he door was open[]" and "announced [him]self." Because Turner lived on the same street, he said to defendant, "hey Rusty, it's BJ, your neighbor." Turner asked defendant if he was "okay" and indicated that he "need[ed] to talk to [him]." According to Turner, defendant was agitated and ordered Turner to leave his house, essentially asserting that Turner was violating his constitutional rights by being in his home and questioning him. Defendant "yell[ed] in a loud voice" that he was not going to talk to Turner.

Turner remained "[i]n the threshold of the doorway in the bathroom" and could see defendant's "shape behind the [frosted shower] glass," which also had a "shower curtain" in front of it. Turner stated he was unsure if defendant had a weapon. Turner repeated that he "need[ed] to talk to [defendant]" and would "wait for [him] to be done," but defendant refused and became "irate" and "belligerent," yelling that Turner "had to leave" and "had to get a warrant."

4

Defendant also declared to Turner that "he was a sovereign citizen" and "had . . . constitutional right[s]."

When Sergeant Weiss arrived as backup, both officers tried to convince defendant to exit the shower. However, defendant refused and "eventually said the only way [they were] getting [him] out of the shower [was] if [they] . . . sho[]t [him]." Weiss testified that in a "last[-]ditch effort" to reason with defendant, he "tr[ied] to open the [shower] door" but defendant "slam[med] the shower door shut." Weiss then reached over the "shower curtain rail" and deployed pepper spray towards defendant. Defendant responded by opening the shower door and "charging out" of the shower at the officers. After defendant disregarded all verbal commands, Weiss deployed pepper spray a second time and a struggle ensued between defendant and Turner. The struggle began on the "bathroom floor and . . . wound up in the hallway of the residence."

During the struggle, defendant removed Turner's taser from the holster and discharged it into the wall behind Turner. Ultimately, the officers were able to subdue defendant, secure him in handcuffs, and take him outside where an ambulance was waiting. Defendant was then transported with a police escort to a hospital for a mental health evaluation and treatment for injuries sustained

from the gasoline. The entire encounter was captured on the officers' body-worn cameras and played for the jury during the trial.

Prior to the trial, defendant had moved to compel discovery of all documentation regarding prior interactions between defendant and members of the Maple Shade Police Department. The State had opposed the motion, arguing it had "turned over everything in [its] possession." The State asserted that defendant's request "for all prior unrelated bad acts that have anything to do with . . . defendant" was "a fishing expedition," and "not relevant" to the case. The judge denied defendant's motion, finding that "the State ha[d] turned over all relevant discovery within its possession" and "[e]vidence of prior contact between the Maple Shade Police Department and . . . defendant [was] not, by itself, relevant."

During the trial, towards the end of Turner's direct examination, the prosecuting attorney asked Turner if he had known defendant from prior encounters. The following questioning ensued:

> [PROSECUTOR]: And based on your work experience do you know [defendant] to have ever used or threatened violence in the past? And we know the suicide attempt, he threatened violence against himself, but what about against others in the past?
>
> [TURNER]: So, [defendant] is somebody that we use as an example for new officers for somebody that could

A-1883-20

be suicidal or violent. There's two instances that come to mind that we share with other officers.

One in which he had pulled a knife on other officers and his father had to intervene and then they were to take him into custody at that point.

And another situation was a domestic violence situation. His sister had injuries as a result. He was going to be arrested for the domestic violence incident. He ingested pills when the police said, hey, you're under arrest and he ate a bunch of pulls in an attempt to kill himself. And in the report it said something to the effect of I'd rather die than go to jail.

Defense counsel did not object to the testimony when it was elicited. However, after direct examination of Turner concluded but before cross-examination commenced, out of the presence of the jury, defense counsel requested a mistrial, arguing to the judge:

On direct examination the prosecutor . . . talked about other acts on the part of [defendant]. There have been no [N.J.R.E.] 404(b) motions made to adduce those acts. Those acts as stated by the officer had to do with a knife that he pulled on other officers and there was a domestic violence incident. . . .

. . . These are issues that should have been . . . decided before trial. And now we're in the midst of trial and these things are coming forward. The prejudice to my client as a result of that is extraordinary.

. . . .

7

This is prosecution by sabotage. We don't bring the things up properly before trial and now we bring them up . . . while the witness is on the stand.

The State countered that the testimony was "not prejudicial" and was "directly relevant" to establish "the officer's state of mind" and to "explain[] the officer's actions" when he entered defendant's residence.

The judge denied the application for a mistrial. The judge expressed surprise that defense counsel did not object immediately when the testimony was elicited but indicated that the issue could "be addressed in a less extreme or radical manner" by "instruct[ing] the jury to not consider th[e] testimony." To support his ruling, the judge explained:

> The [S]ergeant's state of mind was set once he heard that a knife had been pulled at the Jimmy Buffet concert; that there was a fight at the Jimmy Buffet concert; that the defendant tried to jump out of the car; and that he was drunk and that he doused himself with fire.
>
> I think any reasonable person would conclude that this officer was justified in having a state of mind that he was going to stay there until he found out what the real situation was. He wasn't going to leave. And the officer testified we didn't know what was behind the shower curtain, whether he had a weapon when he was in there. We know he had a weapon earlier in the day.
>
> I think that's enough to show state of mind. I think this extra testimony is unduly prejudicial. I would have preferred a 404(b) hearing to look further into it.

8

That didn't happen. I think that it unduly prejudices the jury against [defendant]. I'm going to instruct them not to consider it.

Thereafter, when the jury returned to the courtroom, the judge issued the following instruction:

> During the direct examination by the State of Sergeant Turner you may recall there was a question and I will read it to you.
>
> "Question: And based on your work experience do you know him to have ever used or threatened violence in the past? And we know the suicide attempt he threatened violence against himself, but what about against others in the past?" And there was an answer to that.
>
> I'm going to instruct you to disregard the question and the answer. You are not to consider it in your deliberations. The answer -- and I'll make it clear to you what you are not to consider.
>
> Answer: "So, [defendant]" -- this is the answer of Sergeant Turner -- "So, [defendant] is somebody that we use as an example for new officers for somebody that could be suicidal or violent. There's two instances that came to mind that we share with other officers. One in which he had pulled a knife on other officers and his father had to intervene and then they were taken to -- they took him into custody at that point. And another situation was a domestic violence situation. His sister had injuries as a result. He was going to be arrested for the domestic violence incident. He ingested pills when the police said, hey, you're under arrest and he ate a bunch of pills in an attempt to kill

9

himself. And in the report it said something to the effect of I'd rather die than go to jail."

Again, that is the answer that I'm instructing you to disregard and not to consider in your deliberations as well as the question that preceded it.

In this ensuing appeal, defendant raises the following points for our consideration:

POINT I

[DEFENDANT] WAS DENIED A FAIR TRIAL BECAUSE THE JURY HEARD TESTIMONY THAT HE HAD PREVIOUSLY PULLED A KNIFE ON OTHER POLICE OFFICERS, THAT HE HAD BEEN ARRESTED FOR A DOMESTIC VIOLENCE INCIDENT WHERE IT WAS IMPLIED THAT HE HAD INJURED HIS SISTER, AND THAT HE WAS "SOMEBODY THAT WE USE AS AN EXAMPLE FOR NEW OFFICERS FOR SOMEBODY THAT COULD BE SUICIDAL OR VIOLENT."

A. The Trial Court Failed To Conduct The Required Analysis Before Admitting The Prior Bad Acts Testimony.

B. The Court Erred By Instructing The Jury To Disregard The Testimony Instead Of Granting The Mistrial Motion.

POINT II

THE FAILURE TO INSTRUCT THE JURY THAT [DEFENDANT] HAD THE RIGHT TO RESIST THE OFFICERS'[] USE OF UNLAWFUL FORCE

REQUIRES REVERSAL OF HIS CONVICTIONS.
(NOT RAISED BELOW).

## II.

In his first point, defendant argues the judge's "failure to analyze the testimony under the applicable legal framework found in State v. Cofield, 127 N.J. 328 (1992)" deprived him of "a fair trial" and the judge's "failure to grant the mistrial resulted in extraordinarily unfair prejudice to [defendant]."

N.J.R.E. 404(b) provides that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith." "However, if that evidence is offered to prove other facts in issue such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, it may be admissible subject to a weighing of the probative value against its apparent prejudice." State v. Barden, 195 N.J. 375, 388 (2008).

> In Cofield, the Court articulated a four-part test designed to guide the determination of when to admit such evidence. The Court defined the four-part test as follows:
>
> 1. The evidence of the other crime must be admissible as relevant to a material issue;

2.  It must be similar in kind and reasonably close in time to the offense charged;[1]

3.  The evidence of the other crime must be clear and convincing; and

4.  The probative value of the evidence must not be outweighed by its apparent prejudice.

[Barden, 195 N.J. at 389 (citations omitted) (quoting Cofield, 127 N.J. at 338).]

This analysis is intended to reduce the underlying danger that the factfinder may convict a defendant because "he or she is a 'bad person' who must be guilty of the crime charged." State v. Castagna, 400 N.J. Super. 164, 175 (App. Div. 2008). "Because of the damaging nature of such evidence, the trial court must engage in a 'careful and pragmatic evaluation' of the evidence to determine whether the probative worth of the evidence is outweighed by its potential for undue prejudice." Barden, 195 N.J. at 389 (quoting State v. Stevens, 115 N.J. 289, 303 (1989)). "In the weighing process, the court should also 'consider the availability of other evidence that can be used to prove the same point.'" Ibid. (quoting State v. Jenkins, 178 N.J. 347, 365 (2004)).

---

[1]  "[T]he second prong may be eliminated where it 'serves no beneficial purpose.'" Barden, 195 N.J. at 389 (quoting State v. Williams, 190 N.J. 114, 131 (2007)).

"[U]nder N.J.R.E. 404(b), the party seeking to admit other-crimes evidence bears the burden of establishing that the probative value of the evidence is not outweighed by its apparent prejudice." State v. Reddish, 181 N.J. 553, 608-09 (2004). "In our review of a trial court's determination on the admissibility of the evidence of other crimes under N.J.R.E. 404(b), we give great deference to the decision of the trial court." Barden, 195 N.J. at 390. "However, when a trial court does not analyze the admissibility of other-crimes evidence under Cofield, we may conduct a plenary review to determine its admissibility." Id. at 391.

Here, there can be no question that Turner's serial references to defendant's threats of violence against others in the past, threats that informed law enforcement's view of defendant as "suicidal or violent," fell within the purview of N.J.R.E. 404(b). Because the judge did not analyze the admissibility of the testimony under Cofield, we must conduct a plenary review to determine its admissibility. Based on our review, we conclude the evidence was inadmissible. We reach this conclusion largely because the probative value of the evidence was outweighed by its potential for undue prejudice. "The risk involved with such evidence is 'that it will distract a jury from an independent consideration of the evidence that bears directly on guilt itself.'" State v.

13                                                        A-1883-20

Vallejo, 198 N.J. 122, 133 (2009) (quoting State v. G.S., 145 N.J. 460, 468 (1996)). Indeed, although the judge did not employ a Cofield analysis, in his ruling, he found that the testimony "unduly prejudice[d] the jury against [defendant]."

While we acknowledge that an immediate objection by defense counsel would have been preferable, had the State been more forthcoming when defendant moved prior to the trial to compel discovery of all prior interactions between defendant and members of the Maple Shade Police Department, undoubtedly, the evidence would have been properly vetted and the error avoided entirely. Critically, it was the State's, not defendant's, burden to establish that the probative value of the evidence was not outweighed by its apparent prejudice. Because the State failed to move to admit the evidence in a N.J.R.E. 104 hearing prior to eliciting the objectionable testimony from Sergeant Turner during the trial, the fault lies squarely on the State.

Having determined that the testimony was inadmissible, we must decide whether a mistrial was warranted. "A mistrial is an extraordinary remedy" that should be employed "[o]nly when there has been an obvious failure of justice." State v. Mance, 300 N.J. Super. 37, 57 (App. Div. 1997). "Whether an event at trial justifies a mistrial is a decision 'entrusted to the sound discretion of the trial

14

court.'"  State v. Smith, 224 N.J. 36, 47 (2016) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)).  We "will not disturb a trial court's ruling on a motion for a mistrial, absent an abuse of discretion that results in a manifest injustice." State v. Jackson, 211 N.J. 394, 407 (2012) (quoting Harvey, 151 N.J. at 205).

"To address a motion for a mistrial, trial courts must consider the unique circumstances of the case."  Smith, 224 N.J. at 47.  "If there is 'an appropriate alternative course of action,' a mistrial is not a proper exercise of discretion." Ibid. (quoting State v. Allah, 170 N.J. 269, 281 (2002)).  "For example, a curative instruction, a short adjournment or continuance, or some other remedy, may provide a viable alternative to a mistrial, depending on the facts of the case."  Ibid.

To be sure, "inadmissible evidence frequently, often unavoidably, comes to the attention of the jury, and the record cannot be purged of all extraneous influence."  State v. Winter, 96 N.J. 640, 646 (1984).

> The decision on whether inadmissible evidence is of such a nature as to be susceptible of being cured by a cautionary or limiting instruction, or instead requires the more severe response of a mistrial, is one that is peculiarly within the competence of the trial judge, who has the feel of the case and is best equipped to gauge the effect of a prejudicial comment on the jury in the overall setting.
>
> [Id. at 646-47.]

15

When the trial judge determines that a curative instruction, rather than a mistrial, will suffice to rectify the error, generally, the instruction "must be firm, clear, and accomplished without delay." Vallejo, 198 N.J. at 134. "The same deferential standard that applies to the mistrial-or-no-mistrial decision applies to review of the curative instruction itself." State v. Herbert, 457 N.J. Super. 490, 503 (App. Div. 2019).

Our Supreme Court "has consistently stressed the importance of immediacy and specificity when trial judges provide curative instructions to alleviate potential prejudice to a defendant from inadmissible evidence that has seeped into a trial." Vallejo, 198 N.J. at 135; see State v. Wakefield, 190 N.J. 397, 440 (2007) (noting trial court issued "immediate" curative instructions "promptly and effectively"); State v. Papasavvas, 163 N.J. 565, 614 (2000) (explaining that State expert's testimony regarding defendant's guilt was improper but "the trial court's curative instructions given immediately after [the] statements . . . were sufficient to remedy [the] improper testimony"); Winter, 96 N.J. at 649 (holding instruction sufficient because "[b]efore defense counsel even objected, the court struck the offending remark" and, after brief recess, issued "sharp and complete curative instruction"); State v. La Porte, 62 N.J. 312,

16

A-1883-20

318 (1973) ("The trial judge immediately instructed the jury in the strongest terms to disregard the offending remark.").

In Herbert, we provided guidance in assessing the adequacy of a curative or limiting instruction. "First, a court should consider the nature of the inadmissible evidence the jury heard, and its prejudicial effect." 457 N.J. Super. at 505. In that regard, "[t]he adequacy of a curative instruction necessarily focuses on the capacity of the offending evidence to lead to a verdict that could not otherwise be justly reached." Ibid. (quoting Winter, 96 N.J. at 647). We pointed out that "while a general charge may suffice to cure 'only slightly improper' remarks, 'a single curative instruction may not be sufficient to cure the prejudice resulting from cumulative errors at trial,'" and "[e]vidence that bears directly on the ultimate issue before the jury may be less suitable to curative or limiting instructions than evidence that is indirect and that requires additional logical linkages." Ibid. (quoting Vallejo, 198 N.J. at 136).

"Second, an instruction's timing and substance affect its likelihood of success." Ibid. "As for timing, . . . a swift and firm instruction is better than a delayed one," and "[a]s for substance, a specific and explanatory instruction is often more effective than a general, conclusory one." Id. at 505-06. We noted that an instruction can be more effective when the judge "'explains the reason

for the underlying rule'" and "[a]lthough trial judges may understandably try to avoid repeating and thereby reinforcing an offending remark, a court must describe it with enough specificity to enable the jury to follow the instruction." Id. at 506-07 (quoting David A. Sklansky, Evidentiary Instructions and the Jury as Other, 65 Stan. L. Rev. 407, 452 (2013)).

"Third, a court must ultimately consider its tolerance for the risk of imperfect compliance." Id. at 507. "Yet, even in criminal cases involving errors of constitutional dimension, 'not "any" possibility [of an unjust result] can be enough for a rerun of the trial.'" Ibid. (alteration in original) (quoting Winter, 96 N.J. at 647). "The possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." Ibid. (quoting State v. Macon, 57 N.J. 325, 336 (1971)). "By contrast, a non-constitutional error 'shall be disregarded by the appellate court "unless it is of a nature as to have been clearly capable of producing an unjust result."'" Id. at 507-08 (quoting Winter, 96 N.J. at 648).

Guided by these principles, we are persuaded that the judge's curative instructions did not cure the prejudicial impact of Turner's inadmissible testimony describing defendant's prior violent acts. Although the judge issued swift and firm curative instructions, the instructions did not fully and clearly

18

address the prejudicial aspects of the testimony. We acknowledge that the State's proofs, which included the officers' body-worn cameras depicting the entire encounter, were strong. However, the charges defendant was convicted of both required knowing conduct, while the defense theory was that defendant's conduct was accidental and defendant lacked the requisite mental state. See N.J.S.A. 2C:12-11(a) (providing a person is guilty of second-degree disarming a law enforcement officer when that person "knowingly takes or attempts to exercise unlawful control over a firearm or other weapon in the possession of a law enforcement . . . officer when that officer is acting in the performance of his duties"); N.J.S.A. 2C:12-1(b)(5)(a) (providing a person commits fourth-degree aggravated assault if he "[a]ttempts to cause or purposely, knowingly or recklessly causes bodily injury" to a "law enforcement officer acting in the performance of the officer's duties while in uniform").

That said, the references to defendant's prior bad acts and history of violence with the police and his sister had a real potential to prejudice the defense and reinforce the notion that defendant was predisposed to the acts with which he was charged. In that regard, the references "may not be minimized as 'fleeting comments' that likely escaped the jury's notice." Herbert, 457 N.J. Super. at 508; cf. Jackowitz v. Lang, 408 N.J. Super. 495, 505 (App. Div. 2009)

("Fleeting comments, even if improper, may not warrant a new trial, particularly when the verdict is fair."). Rather, Turner's testimony gave the distinct impression that defendant was known to the police and repeatedly threatened violence to himself and others, prompting a police response. It was a relatively short trial and Turner was one of the only two witnesses who testified at the trial. His testimony could "not [be] missed." Herbert, 457 N.J. Super. at 509.

We would be remiss if we did not express our displeasure with the position taken by the State when defendant moved to compel disclosure of the very same information disclosed during Sergeant Turner's objectionable testimony. The State took the position that it neither possessed such information nor deemed such information relevant to the charges. Even if the information did not come to light until after the discovery motion was adjudicated, it did not absolve the State of its obligation to disclose the information prior to Turner's testimony. Under Rule 3:13-3(b)(1), the State has an affirmative duty to make timely disclosure of "relevant material" to defendant. Moreover, it has "a continuing duty to provide discovery." Rule 3:13-3(f).

Under these circumstances, we have no confidence that defendant's convictions were based on only admissible evidence. Instead, we are convinced that the inadmissible evidence was of "a nature as to have been clearly capable

of producing an unjust result," <u>Winter</u>, 96 N.J. at 648, and the judge's curative instructions were insufficient to cure the prejudice. For this reason, we are constrained to reverse the convictions and remand for a new trial. Given our decision on this point, we need not address defendant's second point that the judge's failure to instruct the jury that he was entitled to use force "in self-defense" constituted plain error.

Reversed and remanded for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1883-20