# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5846-17

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

THOMAS P. CANALES,
a/k/a THOMAS P.
CHAPAWESTON,

      Defendant-Appellant.

_____

Submitted January 4, 2021 – Decided August 20, 2021

Before Judges Hoffman, Suter and Smith.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 17-02-0143.

Joseph E. Krakora, Public Defender, attorney for appellant (David A. Gies, Designated Counsel, on the briefs).

Yolanda Ciccone, Middlesex County Prosecutor, attorney for respondent (Nancy A. Hulett, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Following a trial that extended over parts of three months, a jury found defendant Thomas P. Canales guilty of three counts of second-degree sexual assault against a minor under the age of thirteen, N.J.S.A. 2C:14-2(b); three counts of third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1); and one count of fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b). On May 11, 2018, the trial judge sentenced defendant to an aggregate prison term of seventeen and one-half years. Defendant now appeals his conviction and sentence. Because we conclude there is reasonable doubt as to whether improperly admitted evidence under N.J.R.E. 404(b) led the jury to a result it otherwise might not have reached, we vacate defendant's conviction and sentence, and remand for a new trial.

I.

On February 1, 2017, a Middlesex County grand jury indicted defendant on charges related to four separate incidents, alleging defendant sexually assaulted three girls under the age of thirteen (J.R., H.C., L.K-D.) and one adult woman (E.J.).[1] Specifically, the indictment charged defendant with the

---

[1] We use initials to protect the victims' identities, pursuant to Rule 1:38-3(c)(9), (12).

A-5846-17

following offenses: second-degree sexual assault upon J.R., who was less than thirteen years of age and defendant being at least four years older, N.J.S.A. 2C:14-2(b) (count one); third-degree endangering the welfare of a child, J.R., N.J.S.A. 2C:24-4(a)(1) (count two); second-degree sexual assault upon H.C., who was less than thirteen years of age and defendant being at least four years older, N.J.S.A. 2C:14-2(b) (count three); third-degree endangering the welfare of a child, H.C., N.J.S.A. 2C:24-4(a)(1) (count four); fourth-degree criminal sexual contact against E.J., N.J.S.A. 2C:14-3(b) (count five); second-degree sexual assault upon L.K-D., who was less than thirteen years of age and defendant being at least four years older, N.J.S.A. 2C:14-2(b) (count six); and third-degree endangering the welfare of a child, L.K-D., N.J.S.A. 2C:24-4(a)(1) (count seven).

The assaults alleged in the indictment occurred over a four-month period in four different municipalities in central Middlesex County. Defendant's first trial ended in a mistrial after the jury could not reach a verdict. Defendant's retrial occurred between November 28, 2017 and January 2, 2018. Prior to trial, the State moved for permission to admit certain N.J.R.E. 404(b) evidence as part of its case in chief. The evidence concerned an uncharged sexual assault that occurred on August 26, 2016, two days before the last of the four assaults

3

included in the indictment against defendant. The judge granted the State's motion, following an evidentiary hearing held near the end of the State's case; at the hearing, B.V. – the victim of the uncharged assault – testified. The next day, the State presented the testimony of B.V. as its last witness. Thereafter, defendant testified, denying all allegations; in addition, defendant's wife testified. Following summations and the judge's charge, the jury received the case on December 14, 2017. On the fourth day of deliberations, the jury found defendant guilty of all counts.

We set forth the relevant facts and trial testimony concerning the four charged assaults, followed by the relevant facts and trial testimony concerning the uncharged assault.

### Assault of J.R.

On April 20, 2016, a man in a pickup truck stopped J.R., an eleven-year-old girl, as she walked down her street in North Brunswick. The man asked her if there was anywhere nearby to eat, told her he was there for modeling business, and told her that she was really pretty. At some point, while the man spoke to her, J.R. looked inside the truck; at that point, she saw the man fondling himself with his private parts exposed. After realizing what she just observed, J.R. walked away.

A-5846-17

On April 20, and April 26, 2016, the police interviewed J.R., who recounted for them what happened. The police recorded the latter interview on video, which the State played for the jury at defendant's trial. During the interview, J.R. told the police that the man's truck was dark blue, almost black, and described the man as "kind of chubby" with "really chubby cheeks, and he had kind of like a beard." She stated the man was wearing a backwards baseball cap. On January 3, 2017, suspecting J.R.'s case may be related to other cases, police showed J.R. a photo array, a series of photographs that included defendant's photograph; however, J.R. did not select any of the photographs.

J.R. testified at defendant's trial, describing the man as "tan" with "really chubby cheeks" and "a small forehead, and he was kind of big." She did not remember the color of the truck the man drove, but she did recall it had "the number 4 X 4 on it." J.R. was not asked to identify her assailant.

### Assault of H.C.

On the afternoon of July 3, 2016, seven-year-old H.C. was on the porch of her New Brunswick home playing with her sister when she walked down the stairs to retrieve a ball. At that point, a black car pulled up in front of H.C.'s house, and a man inside the car "said something" to H.C., who looked inside the car and saw the man masturbating. The man then said "sorry" to H.C. At that

5

point, H.C.'s father emerged from the home and yelled at the driver of the car, but the man drove off.

New Brunswick Officer Justin Miller responded to the scene after the man drove off. Officer Miller spoke with H.C., who told him the man in the car "tried to get [her] to come to the vehicle." Officer Miller also testified that H.C.'s father told him that the man was Hispanic and drove a black Honda. Two days later, on July 5, 2016, H.C.'s father informed a detective that H.C. had revealed that the man in the car was masturbating.

On September 1, 2016, the police conducted a recorded forensic interview of H.C., which the State played for the jury at defendant's trial. During the interview, H.C. stated the man in the car was "fat" and had brown skin. She recounted that the man stopped the car and asked her, "Where is the gas station[?]" and that the man was touching his exposed genitalia. Also, during this September 1 interview, the police presented H.C.'s father with a series of photographs, which included a photograph of defendant. H.C.'s father selected the photo of defendant and identified him as the driver of the car.

At trial, H.C.'s father stated the man was driving a black car and that the man "looked Hispanic." He also identified defendant at trial as the driver of the car who spoke to his daughter on July 3, 2016. On cross-examination, H.C.'s

6

father acknowledged that at defendant's first trial, the judge asked him, "[D]o you see the person in court[?]," and he responded, "I can't see him." When asked to explain the change in his testimony from only three months earlier, H.C.'s father explained, "Because I was afraid that day."

H.C. also testified at trial, stating the man "looked like he was brown. Like dark brown. And he didn't have hair." She was not asked if the driver of the car was in court.

Assault of E.J.

On August 25, 2016, E.J., an Edison resident in her thirties, walked with her three-year old daughter to a park near the apartment complex where they lived. E.J. and her daughter were alone until a man arrived and sat on a bench in front of the playground's slide. E.J. realized the man was watching her and her daughter and decided to go home. Back at the apartment complex, E.J. went to get chalk out of her car for her daughter when the man appeared and walked toward her. The man asked E.J. for directions to Highland Park and asked the age of her daughter. When E.J. turned to point in the direction of Highland Park, the man groped and squeezed E.J.'s buttocks. He then ran away.

Police eventually connected the assault of E.J. with the other cases and arranged for E.J. to view a photo array on September 8, 2016. During this

7

review, E.J. selected defendant's photo and stated, "He looks familiar, but I'm not one hundred . . . percent sure." At defendant's trial, she explained that "after picking him out from the line of photos, I was somewhat concerned . . . as to the question[,] what if I picked the wrong person[?], but sometime later I saw his picture again in a newspaper article and I realized that that was the right person." E.J. also identified defendant in court as the man she saw at the park in Edison and the man who groped her. Additionally, the State played surveillance video from the area where the assault took place, and E.J. pointed out herself and her daughter walking back to the apartment complex, defendant following them, and then defendant running away.

## Assault of L.K-D.

On August 28, 2016, at around 8:30 p.m., eleven-year-old L.K-D. went outside to retrieve her phone from the family car parked at the curb in front of their home in Highland Park. When L.K-D. went to open the car door, she realized someone was behind her. It was a man, who L.K-D. did not know. He asked her for directions. She answered his question and the man thanked her and tried to shake her hand. The man then grabbed L.K-D.'s arm and touched her buttocks once or twice. The car door was still open and L.K-D. managed to climb inside. L.K-D. moved to the back of the car while the man poked his head

8

through the doorway of the car and asked L.K-D. her name. The man also told L.K-D. to take off her shirt and touched her stomach. Eventually, the man ran away.

On the night of the assault, police conducted a videotaped interview of L.K-D., which the State played for the jury at defendant's trial. During this interview, L.K-D. said the man had "dark hair," which was "short and spiky." She also stated he was white and appeared to be in his forties.

Three days later, on August 31, 2016, police arranged a photo array for L.K-D. that contained defendant's photograph; however, L.K-D. did not select a photograph from the array.

At defendant's trial, L.K-D.'s father testified that on the night of the attack, L.K-D. told her the man who attacked her was white. L.K-D. testified that she did not remember what the man looked like and stated she "couldn't see him very well." L.K-D. was not asked to identify her assailant.

### Uncharged Assault of B.V.

At approximately 8 a.m. on August 26, 2016, B.V., a twenty-year old college student, was walking to work in New Brunswick when a "smaller car" that was "either black or navy blue" pulled up next to her. The car had a New Jersey license plate. The man driving the car rolled down his passenger window

9

and asked her for directions to the nearest gas station. As B.V. began answering the man's question, she peered into the car through the open window and observed that the man "had exposed himself and was masturbating in the front seat." She then walked away because she "needed to get to work" and "it just seemed easier and better just to get to work." Later that day, however, B.V. reported the incident to the police, informing them the perpetrator was "a white male . . . ."

On September 10, 2016, the police arranged for B.V. to view a photo array containing six photographs. B.V. selected defendant's picture and stated, "This one is recognizable. . . . Like I feel that this one is like the most – like the face structure, this is like the face I remember. Because a lot of his face was covered, but like this is like the face I remember." She stated she was seventy-five percent certain she identified the correct person. Defendant was not charged with any crime related to the assault of B.V.

### Defendant's Arrest and First Trial

On August 28, 2016, the same day of the assault of L.K-D., but earlier during the day, G.S., J.B. and some other friends opened a lemonade stand not far from their homes in Highland Park. G.S. was then thirteen years old and J.B. ten years old.

10

A truck pulled up to the lemonade stand and its driver asked the girls for directions to a gas station, which G.S. provided. At trial, G.S. stated the truck was "like a metallic like grayish," and she was "pretty sure it was Ford." She remembered the man had "like maybe like a darker skin kind of like mine, but like maybe like darker or lighter, it was, because it's like dark in the car. Not really dark in the car, but it was not easy to see." The man had a slight Spanish accent and was wearing a red shirt. J.B. testified at trial that the driver of the truck "looked Hispanic. He was like a little bit thicker and he had dark hair, like dark brown hair," which was "a little bit curly but . . . not like super curly. Just like little curls." J.B. also stated the man had some hair on his chin and cheeks.

The same truck returned to the lemonade stand and gave one of the girls a dollar. When G.S.'s mother approached the truck, it drove away. The truck returned again, and the driver attempted to give the girls another dollar, but they declined it. As the truck drove away, J.B. wrote down the truck's license plate number on her arm. Later that evening, the parents of the girls contacted the police and reported the suspicious man driving the truck.

Because the assault of L.K-D. occurred only blocks away from where G.S. and J.B. set up their lemonade stand, the police began considering the two events might be related. The police completed a look-up of the license plate number

11

J.B. wrote on her arm, which yielded defendant's name and address. On August 30, 2016, the police drove to defendant's address and observed a charcoal gray pick-up truck with the license plate number written down by J.B.; in addition, they observed a black Honda Accord registered to defendant's wife.

Meanwhile, Highland Park police posted a TRAX bulletin to other law enforcement departments about the incident involving L.K-D. to see if a similar incident had occurred elsewhere. A New Brunswick police officer, who investigated the assault of H.C., saw the bulletin and thought the cases were connected based on the fact that they both involved an adult asking children for directions. This led to a September 1, 2016 meeting between the police, H.C., and H.C.'s father, where H.C.'s father selected defendant's picture from a photo array. The police arrested defendant that day. After the police connected defendant to the other alleged assaults, the Middlesex County grand jury returned the seven-count indictment against defendant previously described. Defendant's first trial on these charges began in July 2017; however, the judge declared a mistrial after the jury could not reach a verdict.

### Defendant's Second Trial

The State retried defendant, this second jury trial taking place between November 28, 2017 and January 2, 2018, including six days of witness

12

testimony. J.R., H.C., H.C.'s father, E.J., B.V., L.K-D., L.K-D.'s father, G.S., G.S.'s mother, J.B., and various police witnesses testified for the State. The State also played police video recordings of the photo array identification procedures utilized with J.R., H.C.'s father, E.J., B.V, and L.K-D.

The State also presented a cell tower map, generated using defendant's cell phone records, which showed that a short time before the North Brunswick incident in April 2016, a call from defendant's cell phone hit a cell phone tower in North Brunswick; that a short time before the New Brunswick incident on July 3, 2016, a phone call from defendant hit a cell phone tower in New Brunswick; that defendant's last phone call prior to the Edison incident on August 25, 2016 hit a cell phone tower in Edison; that within twenty minutes of the Highland Park incident on August 28, 2016, a phone call from defendant's phone hit a cell phone tower in Highland Park. Additionally, firefighters of the East Franklin Fire Department, of which defendant was a member in 2016, testified that defendant helped cover fire protection for the fire department in Highland Park on August 28, 2016, the day of the Highland Park incidents involving the lemonade stand and L.K-D. They testified that defendant and two other firefighters rode in a fire truck to Highland Park's fire station in the

13

morning and rode back to East Franklin on the truck shortly after the Highland Park firefighters returned from their training, at around 1:00 or 2:00 p.m.

Notwithstanding the substantial evidence already presented, the State sought to end its case by admitting evidence of B.V.'s assault under N.J.R.E. 404(b). On December 11 and 13, 2017, the trial judge held a N.J.R.E. 104(c) hearing on the State's motion. At the hearing, B.V. recounted what occurred on August 26, 2016, describing the perpetrator as a "heavier-set" white man wearing sunglasses. She also stated she remembered telling the police the man had a goatee. Notably, when asked by the prosecutor if she would be able to identify the man again if she saw him in person, B.V. stated she did not think she could.

After B.V.'s testified, defendant's attorney argued that evidence of B.V.'s assault should not be admitted because the risk of undue prejudice outweighed the evidence's probative value. Specifically, he argued B.V.'s testimony lacked probative value because of her admitted inability to identify her assailant and her uncertainty in selecting defendant's picture during the photo array. He contended the prejudicial effect of "pil[ing] on" an unreliable fifth accusation thus outweighed the non-existent or minimal probative value of the evidence of the uncharged assault of B.V. Rejecting this argument, the trial judge granted

14

the State's motion and admitted B.V.'s testimony, finding it satisfied the requirements set forth in State v. Cofield, 127 N.J. 328 (1992) and State v. Fortin (Fortin I), 162 N.J. 517 (2000).

When B.V. testified at trial, she recalled telling police that her assailant "was a more heavyset man[,]" and she remembered "he had like shorter hair" and "some facial hair like a goatee." She recalled he "was wearing sunglasses, so I couldn't really see his face that well, but I could see it enough, I guess." She also stated, "[f]rom what I could tell, he was definitely lighter complexion, so I assumed he was white." B.V. did not bend down to look at the man as she spoke to him. She described the man's car as "small and dark in color, like black or navy blue."

Despite B.V.'s statement at the motion hearing that she did not think she would be able to identify her assailant if she saw him again in person, at trial, the following exchange inexplicably took place between the prosecutor and B.V. during direct examination:

> Q: And in discussing this matter with you, I've asked you if you could recognize the person if you saw him again. You indicated that you could. Is that correct?
>
> A: Yes.

Q:     All right. Let me ask you this. If you look at the photograph that you selected back in September of 2016, could you tell us if the person in that photograph is here in the courtroom?

A:     No. No, I don't think he is in the courtroom.

After the State rested, defendant testified, denying the allegations against him. He admitted he was in Edison on the day of E.J.'s assault, though he claimed he was cutting lawns there. In addition, he admitted he was in Highland Park on August 28, when he accompanied other members of the East Franklin Fire Department. Defendant recounted,

> [W]hile we were at Highland Park, we responded to two calls. While we were on those two calls, I noticed . . . a couple properties that I wanted to pick up for landscaping, [I] was trying to build my accounts in [the] Highland Park area due to the fact that I had lost a couple of them. And so I went back to Highland Park to try to measure the properties and get some more information on them.

Regarding this return to Highland Park, defendant recalled, "I definitely remember the lemonade stand. I remember pulling up and asking for lemonade when I saw the stand"; however, "they didn't have any ready." Defendant testified he left the area "between 6 and 7 p.m." and "went fishing."

On January 2, 2018, on the fourth day of deliberations, the jury returned its verdict, finding defendant guilty on all seven charged counts. On May 11,

16

2018, the trial judge sentenced defendant to an aggregate prison term of seventeen and one-half years, representing two concurrent eight-year terms on counts one and three, a consecutive eighteen-month sentence on count five, and a consecutive sentence of eight years on count six. The sentences for counts one, three, and six were subject to periods of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2. The judge merged count two with count one, count four with count three, and count seven with count six.

This appeal followed, with defendant raising the following arguments:

POINT ONE

THE TRIAL JUDGE'S FINDING THAT THE UBIQUITOUS FEATURES DEMONSTRATED A SUFFICIENTLY SIMILAR UNIQUENESS WAS AN ABUSE OF DISCRETION.

POINT TWO

THE TRIAL JUDGE'S JURY CHARGE AS TO THE MANNER IN WHICH B.V.'S TESTIMONY, TOGETHER WITH THE ADMISSION OF THE PHOTOGRAPH SHE IDENTIFIED, COULD BE USED DURING DELIBERATIONS REGARDING THE QUESTION OF IDENTITY WAS PLAIN ERROR. (Not raised below).

POINT THREE

THE CONSECUTIVE PORTION OF THE SENTENCE IMPOSED WAS EXCESSIVE.

POINT FOUR

THE FAILURE TO SEVER THE FOUR SEPARATE INCIDENTS OF SEXUAL ASSAULT WAS CLEARLY CAPABLE OF PRODUCING AN UNJUST RESULT. (Not raised below).
POINT FIVE

THE TRIAL ATTORNEY'S FAILURE TO MAKE A MOTION TO SEVER AMOUNTED TO INEFFECTIVE ASSISTANCE OF COUNSEL. (Not raised below).

II.

Defendant challenges the trial judge's admission of B.V.'s testimony, arguing it failed to meet the "stringent" requirements to admit evidence when offered under N.J.R.E. 404(b) "to link a particular defendant to a crime on the basis of modus operandi, or a signature way of committing the crime." State v. Sterling, 215 N.J. 65, 93 (2013) (citing Fortin I, 162 N.J. at 530-31). We agree.

N.J.R.E. 404(b) governs other crimes, wrongs, or acts evidence as follows:

> [E]vidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

In light of its potential for prejudice, "[e]vidence relating to other crimes is handled with particular caution." State v. Reddish, 181 N.J. 553, 608 (2004). The concern in admitting evidence of other crimes or bad acts "is that a jury may convict a defendant not for the offense charged, but for the extrinsic offense[,]" State v. Garrison, 228 N.J. 182, 193-94 (2017), or "because he is 'a "bad" person in general[,]'" Cofield, 127 N.J. at 336 (quoting State v. Gibbons, 105 N.J. 67, 77 (1987)).

Because of the dangers that admission of other crimes evidence presents, "evidence proffered under Rule 404(b) 'must pass [a] rigorous test.'" Garrison, 228 N.J. at 194 (quoting State v. Kemp, 195 N.J. 136, 159 (2008)). Under this test, commonly known as the Cofield test, evidence is admissible under N.J.R.E. 404(b) if the following four prongs are met:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [Cofield, 127 N.J. at 338.]

Under the first prong of the <u>Cofield</u> test, "[e]vidence is relevant if it tends 'to prove or disprove any fact of consequence to the determination of the action.'" <u>State v. Covell</u>, 157 N.J. 554, 565 (1999) (quoting N.J.R.E. 401). To satisfy the first prong, the offered evidence must also concern a material issue. <u>State v. Rose</u>, 206 N.J. 141, 160 (2011) (quoting <u>State v. P.S.</u>, 202 N.J. 232, 256 (2010)). An issue is material if "the matter was projected by the defense as arguable before trial, raised by the defense at trial, or was one that the defense refused to concede." <u>Ibid.</u> (quoting <u>P.S.</u>, 202 N.J. at 256). Identity is a material issue when a defendant claims he was not the perpetrator of the charged crime. <u>See</u> <u>Sterling</u>, 215 N.J. at 99; <u>State v. Baluch</u>, 341 N.J. Super. 141, 192 (App. Div. 2011).

Proof of the second prong is not required in all cases, but only in those that replicate the facts in <u>Cofield</u>, where "evidence of drug possession that occurred subsequent to the drug incident that was the subject of the prosecution was relevant to prove possession of the drugs in the charged offense." <u>State v. Barden</u>, 195 N.J. 375, 389 (2008).

The third prong requires clear and convincing proof that the person against whom the evidence is introduced actually committed the other crime or wrong. <u>State v. Carlucci</u>, 217 N.J. 129, 143 (2014). "[T]he prosecution must establish

that the act of uncharged misconduct . . . actually happened by 'clear and convincing' evidence." Rose, 206 N.J. at 160 (quoting Cofield, 127 N.J. at 338).

Last, the fourth prong is "generally the most difficult part of the test." Barden, 195 N.J. at 389. "Because of the damaging nature of such evidence, the trial court must engage in a 'careful and pragmatic evaluation' of the evidence to determine whether the probative worth of the evidence is outweighed by its potential for undue prejudice." Ibid. (quoting State v. Stevens, 115 N.J. 289, 303 (1989)). The analysis incorporates balancing prejudice versus probative value required by N.J.R.E. 403, but does not require, as does N.J.R.E. 403, that the prejudice substantially outweigh the probative value of the evidence. Reddish, 181 N.J. at 608. Rather, the risk of undue prejudice must merely outweigh the probative value. Ibid.

We review a trial court's ruling on the admissibility of other crimes, wrongs, or bad acts evidence for abuse of discretion. Barden, 195 N.J. 390-91. We afford great deference to the court's ruling and will reverse only where there was a clear error of judgment. Ibid.

Generally, evidence of a crime or bad act may be used to prove identity in two situations: 1) when specific evidence derived from one offense connects multiple offenses; or 2) when the crimes are signature crimes. Sterling, 215 N.J.

21

at 92-93. For example, joinder has been permitted where police found specific items stolen during the first burglary when they arrested defendant for the second burglary. State v. Pierro, 355 N.J. Super. 109, 117 (App. Div. 2002). Alternatively, courts have admitted signature-crime evidence to prove identity when the unique nature of the crimes is clear. State v. Fortin (Fortin II), 189 N.J. 579, 594 (2007). "The conduct in question must be unusual and distinctive," and "there must be proof of sufficient facts in both crimes to establish an unusual pattern." Fortin, 162 N.J. at 530 (quoting State v. Reldan, 185 N.J. Super. 494, 502-03 (App. Div. 1982)). However, "[t]he standard for admitting other-crimes evidence to prove identity becomes more stringent when the State attempts to link a particular defendant to a crime on the basis of modus operandi, or a signature way of committing the crime." Sterling, 215 N.J. at 93.

Here, we are convinced the trial judge mistakenly exercised her discretion by admitting evidence of B.V.'s assault because this evidence did not satisfy the requirements for admission under N.J.R.E. 404(b). Our concerns begin with the third Cofield prong, which required the State prove by clear and convincing evidence that defendant actually committed the assault of B.V. The trial judge found the State clearly and convincingly established defendant assaulted B.V. based on

the totality of her testimony regarding the incident, including her description of being stopped by a man in a small black car asking for directions to a gas station, followed by his exposing himself.

Her testimony in that regard was solid. She did report the incident that day, the day it happened, and she identified the defendant, as I said, in the lineup on the video with 75 percent certainty. The [c]ourt is aware from the trial that the defendant has access to a black Honda that is registered to his wife, when the vehicles were traced back from the lemonade stand young lady's writing down his license plate number.

The judge, however, failed to appreciate the significance of B.V.'s acknowledgement during the N.J.R.E. 104(c) hearing that she did not think she could identify the perpetrator if she saw him again. Indeed, when she testified before the jury, she was asked to "look at the photograph that you selected back in September of 2016," and "tell us if the person in that photograph is here in the courtroom?" B.V. responded, "No. No, I don't think he is in the courtroom."

Our Supreme Court has ruled that video evidence allegedly depicting a defendant committing an uncharged robbery "did not satisfy the Cofield admissibility standard that the evidence must be clear and convincing" when "the masked robbers recorded on the videotape were unrecognizable." State v. Darby, 174 N.J. 509, 521 (2002). This is analogous to the case under review, where B.V. indicated she could not recognize the man who assaulted her. At

the very least, B.V.'s admitted inability to identify her attacker seriously undermines the trial judge's finding that the evidence defendant assaulted B.V. was clear and convincing. Cf. State v. Angoy, 329 N.J. Super. 79, 86-87 (App. Div. 2000) (finding "the State met the 'clear and convincing' standard" under Cofield by presenting a witness who described the defendant's prior bad act through testimony that was "consistent, detailed, and specific.").

B.V.'s uncertainty as to defendant's identity also implicates the first and fourth Cofield prongs. The first prong requires the other-crimes evidence be relevant. However, because B.V. could not identify defendant, her testimony had little or no tendency to prove defendant's identity as the perpetrator of the charged sexual assaults. The evidence of B.V.'s assault thus had no or minimal probative value, which was outweighed by the prejudice inherent in other-crimes evidence. See Darby, 174 N.J. at 521 ("The videotape was not relevant and hence had no probative value.").

When B.V. informed the judge, outside the presence of the jury, that she could not identify defendant, the judge should not have allowed the jury to hear B.V.'s testimony. Permitting B.V. to testify, knowing she could not identify defendant, constituted harmful error that compromised defendant's right to a fair trial.

24

The trial judge's reliance on Fortin I was misplaced. While Fortin I recognized the principle that 404(b) evidence is admissible to prove identity when the "bizarre quality of the crime is self-evident," the issue there involved whether the comparative analysis of the "signature-crime" evidence with the crimes set forth in the indictment required expert testimony. Fortin I, 189 N. J. at 595-596. No such issue was presented in this case.

The trial judge also cited State v. Porambo, 266 N.J. Super. 416 (App. Div. 1988) as providing support for her decision to allow the State to admit the B.V. incident as part of its case. In Porambo, we found no abuse of discretion when the trial court allowed the State to admit evidence of the defendant's participation in another robbery to prove his identity in the crime charged in the indictment. Id. at 423. We determined the trial judge's finding was reasonable to warrant admission of the other robbery where the two crimes had "similar, unusual, and distinctive features," such as the defendant gained entry wearing a beard and mustache disguise and posed as a fireman in one assault and as a policeman in the other. Id. at 423-24.

Unlike Porambo, the trial judge here found that the features characterizing the circumstances in these incidents "may not be signature crimes." Notwithstanding this finding, the judge nonetheless determined that the

25

incidents were "unique enough" based on "locations," "vehicles" and "timings" to suggest a "sufficiently similar" modus operandi. Because the "sufficiently similar" standard does not reflect the heightened burden which involves a finding of "unusual and distinctive features," the trial judge's decision to admit the B.V. incident constituted a clear mistaken exercise of discretion.

We reject the State's argument that we find the introduction B.V.'s testimony as other-crimes evidence amounted to harmless error. There were inconsistencies between B.V.'s description of her assailant and the descriptions provided by the victims of the charged assaults, most notably in terms of his skin color; in addition, three of the victims of the charged assaults did not identify defendant, either during the photo array identification procedure or at trial. Defendant's identity as the perpetrator of the four charged assaults was the major issue at trial. We therefore conclude the trial judge's error in admitting B.V.'s testimony was a clear error of judgment that was "clearly capable of producing an unjust result." State v. Shepard, 437 N.J. Super. 171, 188 (App. Div. 2014) (citing R. 2:10-2).

Because we vacate defendant's conviction and sentence based on the harmful error in admitting B.V.'s testimony under N.J.R.E. 404(b), we decline to address defendant's remaining arguments.

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

27