# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0763-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ISAQUIEL ESCALONA-
FLORES,

    Defendant-Appellant.

_____

Submitted January 30, 2025 – Decided February 21, 2025

Before Judges Natali, Walcott-Henderson, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 22-04-0665.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Laura B. Lasota, Assistant Deputy Public Defender, of counsel and on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent (Leslie-Ann M. Justus, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant Isaquiel Escalona-Flores appeals from the December 21, 2022 judgment of conviction entered after a jury found him guilty of aggravated sexual assault of his former girlfriend's minor daughters, V.L. and K.R., and other related offenses.[1]  We affirm defendant's conviction and sentence but remand to vacate the restitution award that was incorrectly included on the judgment of conviction.

The State alleged the victims' mother, A.M., and defendant began dating in approximately 2011, and shortly thereafter, defendant moved into the home in Lakewood where A.M. resided with V.L. and K.R.  They resided together there for approximately seven years before moving to a home in Brick. Defendant began sexually abusing the girls in Lakewood in 2011 when V.L. was seven years old and K.R. was five years old.  The sexual abuse continued in Lakewood and Brick until 2019 when V.L. was fourteen years old and K.R. was twelve years old.  The State also alleged defendant placed a hidden camera in the girls' bathroom and took videos and photographs of them naked, which he stored on his cell phone.

---

[1]  We utilize initials to protect the confidentiality of victims of sexual assault or abuse.  R. 1:38-3(c)(9).

Defendant was indicted on four counts of first-degree aggravated sexual assault of victims under thirteen years old, N.J.S.A. 2C:14-2(a)(1) (counts one, two, nine, and ten); two counts of second-degree sexual assault of victims under thirteen years old and defendant was at least four years older, N.J.S.A. 2C:14-2(b) (counts three and eleven); two counts of first-degree aggravated sexual assault of victims at least thirteen but less than sixteen years old and defendant standing in loco parentis within the household, N.J.S.A. 2C:14-2(a)(2)(c) (counts four and twelve); two counts of second-degree sexual assault of victims at least thirteen but less than sixteen years old and defendant was at least four years older, N.J.S.A. 2C:14-2(c)(4) (counts five and thirteen); two counts of third-degree aggravated criminal sexual contact of victims at least thirteen but less than sixteen years old and defendant standing in loco parentis within the household, N.J.S.A. 2C:14-3(a) (counts six and fourteen); two counts of third-degree invasion of privacy, N.J.S.A. 2C:14-9(b)(1) (counts seven and fifteen); and two counts of third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1) (counts eight and sixteen).

Defendant moved pre-trial to sever the counts of the indictment related to V.L. and K.R. for separate trials. The State moved to admit fresh complaint testimony by various witnesses. On May 3, 4, and 5, 2022, the court conducted

an evidentiary hearing. By orders dated May 5, 2022, the court denied defendant's motion to sever supported by an oral opinion and granted the State's motion to admit fresh complaint testimony supported by a written opinion. Defendant does not appeal from those orders.

Trial was conducted on May 16, 17, 18, 19, 20, and 23, 2022. A.M.'s former sister-in-law and V.L.'s aunt, M.G., testified as a fresh complaint witness. She testified A.M., V.L., and K.R. were having dinner at her house shortly before V.L.'s fifteenth-birthday Quinceañera celebration that was held on May 11, 2019. They were discussing A.M.'s intention to marry defendant when K.R. said, "if [A.M.] knew what [defendant] was doing to her[,] . . . [A.M.] would not want to marry him." K.R. then began to cry and "told [her] that [defendant] had touched her." K.R. said defendant "would touch . . . her private parts."

V.L. "started crying, too. And then [V.L.] told [her] that [defendant] was doing the same with her, that he . . . would also touch her." V.L. said "it had been going on for a while," and defendant "would put on adult films for her and then he would ask her if she wanted him to do the same things to her."

A.M. testified K.R. was born prematurely with birth defects because of physical abuse by her biological father. Defendant moved in with her after they started dating and he would care for the girls when A.M. was at work. In

September 2018, V.L. was home with K.R. and was wearing a towel in the bathroom. Defendant called V.L. on the phone and asked why she was wearing a towel. V.L. was confused about how defendant knew what she was wearing because defendant was not home at the time. As a result, V.L. discovered a hidden camera installed in the bathroom, which defendant previously told them was "a charger." V.L. told A.M. about the incident. A.M. believed the device was a charger because she "would always ask [defendant] what it was, and he would say it was a charger."

A.M. checked defendant's cell phone and found photographs and videos of her daughters naked in the bathroom. She confronted defendant about her findings and recorded the conversation using her cell phone hidden under a pillow in her bedroom. The audio recording, which was approximately two hours long and in Spanish, was played for the jury.[2] A.M. identified defendant as the person in the recording.

In the recording, defendant admitted he placed a hidden camera in the bathroom and took photographs and videos of the girls while they were naked. He admitted it was wrong to do that and assured A.M. he deleted the images. Defendant said he was monitoring the girls because he was "overprotective." He

---

[2] The jurors were provided a written transcript with an English translation.

A-0763-22

claimed, "those things are not for [him] to watch again, again, and again or something like that."

A.M. also asked defendant if he showed the girls pornography because they both told her he did. Defendant responded, "sometimes things suddenly come on, like on the internet when we watch movies. We are watching a movie and suddenly something comes out that is just those things." He denied telling them to watch pornography, but suggested "[m]aybe you know that when you click a movie on the internet that suddenly you click and like dirty things come up. Maybe [he] told [them] not to watch it, or [he did not] know, [he did] not remember."

At some point after that conversation, A.M. checked defendant's cell phone again to "see if he really had erased the videos and the pictures, and [she] realized that he had not erased them." She confronted defendant and he insisted "[he] erased them." On another occasion, A.M. found defendant in the bathroom and "he had [her] daughter's panties . . . he was smelling [them]." Defendant claimed he thought they were A.M.'s panties.

A.M. testified that prior to V.L.'s Quinceañera in May 2019, she was with V.L. and K.R. having dinner at M.G.'s house. They were discussing the possibility of A.M. marrying defendant when K.R. said, "oh, [m]om, if you only

6

knew," and V.L. told K.R., "do[ not] say anything."  K.R. started to cry and "started to talk and say that [defendant] would abuse her."  V.L. also said "he would abuse them, that he would touch them."  A.M. decided to wait until after the Quinceañera scheduled for May 11 to confront defendant because she "could[ not] ruin the party for [her] daughter."

On May 20, 2019, A.M., V.L., and K.R. confronted defendant in the girls' bedroom.  Defendant "said, yes, that it was happening, the things that [her] daughters had told [her] was happening" and "that he is guilty for what he had done to the girls."  A.M. again recorded the conversation on her cell phone. Defendant admitted "the things . . . [her] daughters had told [her were] happening."[3]

After the confrontation, A.M. and the girls went to M.G.'s house.  On May 22, defendant sent A.M. a text message in which he asked her to forgive him "for what he[ had] done wrong."  On May 23, A.M. told her adult sons about the abuse, and one of them called the police.  A.M. took her daughters to the police station where they gave statements.

---

[3]  As discussed later in this opinion, the recording was played during the testimony of V.L.

On cross-examination, A.M. testified that on June 30, Jolene Lopez of the New Jersey Division of Child Protection and Permanency (DCPP) came to her home and A.M. asked her about obtaining a U Visa "because [she] had suffered domestic violence" by K.R.'s father, the "sexual assault against [her] children," and K.R.'s disability. They also discussed the possibility of medical insurance so K.R. could "have an operation on her hand."

K.R. testified that before she was twelve years old, defendant touched her chest and her vagina with his hand both under and over her clothes. The touching happened in A.M.'s room and K.R.'s room. The first incident happened when they lived in Lakewood, and it continued after they moved to Brick. He attempted to put his penis in her vagina "multiple times . . . but [she] kept moving so he could[ not]." He entered her room and climbed up into her bunk bed, and "then he took his penis out, he put it inside of [her,] and then he raped [her]. When he was finished, he said I love you." He left the room, and she "checked [herself] and [she] saw blood."

She "was so scared, [she] did[ not] want to tell anyone about it. [She] was embarrassed." She "was afraid . . . [A.M] would[ not] believe [her] and that [defendant] would . . . do something to [A.M.]." Eventually she told V.L., who "told [K.R.] that it happened to her," but they later said they were joking.

A-0763-22

One "day after school," K.R. and V.L. were sleeping in A.M.'s room and defendant came in. K.R. "woke up because [she] felt the bed was moving and [she] thought it was [her], that he was next to [her], but it was" V.L. K.R. "started crying . . . because [she] did[ not] know what to do. [She] always thought . . . he could do it to [her] but not to [her] sister." On a second occasion, K.R. and V.L. were in A.M.'s room and defendant "told [her] to leave the room and he would like to have a talk with" V.L. K.R. "was . . . worried" and went back "into the room and [she] saw him next to [V.L.] . . . with their clothes off."

The last incident of abuse occurred in A.M.'s room when K.R. "was turning [twelve]." Defendant pulled her by the arm and "said . . . come . . . sit with [him]." She "went to his bed because [she] was tired, [and she] did[ not] want to . . . fight over it." She "sat next to him and . . . pretended to fall asleep. Then he took off [her] . . . bottom clothes and . . . started . . . getting his penis out and then [she] felt it behind [her]." She was laying on the bed "sideways" and "he put [her] on top of [him] and he did it . . . put it in." She "fe[lt] it in" and "it hurt."

K.R. told A.M. and M.G. at M.G.'s house when they were having dinner. A.M. was talking about marrying defendant and K.R. said "only if you knew what he did." V.L. told her not to say anything. A.M. and M.G. asked what she

9

meant by that and K.R. "started bawling . . . and shaking" and said defendant touched her. They asked V.L. the same question and they "both said yes."

V.L. testified that beginning when she was "around ten" years old, she would "get oral from [defendant]" and he would touch her "breasts." Defendant would "bring [her] to the room so [they] could talk" and "then he would just have porn on his phone[,] and [she] would just watch it. [They] would just watch it and then it would just progress to him pulling [her] pants and then just doing it." "He would pull [her pants] off or [she] would willingly take them off."

V.L. would sometimes touch defendant's penis and "[i]t would be masturbation." "It would be the same way basically, where [they] would watch porn and then it just happened[. She] watched someone else do it on there and then . . . [she] just did it on him." When she was eleven or twelve, she "put [her] mouth on his penis" and gave "him oral." On one occasion, defendant asked "if he could" have vaginal intercourse with her, "and [she] said no." The abuse stopped when she was fourteen. She "told him [she] did[ not] want to do it anymore, [and] that[ is] when [she] set [her] foot down" because she "did[ not] want to do it anymore."

V.L. testified they were "doing something at the dining table" during a visit to M.G.'s house before her Quinceañera when "[her] sister told [her] mom

10

and then [she] just decided to tell her from there."  K.R. "started saying that . . . we could put him in jail," and V.L. "told her to shut up, [she] did[ not] want her to say anything.  And then [they] just told [M.G.] from there because she wanted [them] to say something."  V.L. was scared to say anything and thought the abuse was her fault "because [she] never said no."

V.L. and K.R. previously had a conversation in which they both disclosed defendant was touching them, but they both said they were joking.  After that, V.L. thought "something was happening with" K.R. and "that was why [she] said something."  She "was[ not] believing the thought that he was doing something to her.  So [she] could[ not] [sic] with [herself] . . . knowing that [K.R.] was getting hurt, so [she] . . . had to say something."

A week or two after her Quinceañera, V.L. confronted defendant with A.M. and K.R. in the girls' bedroom.  She did not know A.M. was recording the conversation, but she listened to the recording and identified defendant's voice.  The recording was approximately two and one-half hours long and was played for the jury.[4]

---

[4]  Again, the recording was in Spanish and the jurors were provided with a transcript in English.

A-0763-22

In the recording, defendant admitted he allowed V.L. to watch pornography and "[l]ike she is saying, [he] touched her. One time[, he] was lying down, she was watching videos and . . . she started to put her hands on [him]." He continued, "she was . . . touching [him] all over. [He] was lying down and . . . she grabbed [his] hand and placed it on her stomach." "[He] touched her, but she touched [him] too. In other words, whatever happened, [they] both agreed." He "was with her . . . or [he] touched her, [they] touched each other or whatever." He told V.L. she "should have said no. I[ would] rather not do this . . . and [they] would[ not] have done anything. [He] had no reason to force [her] to do things [she] did[ not] want to do." Defendant "was afraid that if [he] did[ not] do what [V.L.] told him, she was going to tell" A.M.

Defendant denied sexually abusing K.R. A.M. asked defendant, "how could you do that to a disabled girl?" He responded, "that[ is] what [he was] saying, it makes no sense." He claimed, "if one time [he] hugged [her] or anything like that, by mistake maybe, you think that[ is] . . . because sometimes [he] hug[s her], [he] kiss[es] [her], and [she] . . . kind of take[s] it as something that is not normal . . . it could be a misunderstanding."

Defendant did not testify. In his opening statement, defense counsel asserted the girls' claims are "a story . . . fabricated by these two alleged victims

12

in concert with the mother and the aunt." The recordings, he argued, were "made by the mother where [defendant] was alleged to have made statements to his detriment. Again, fabricated, fabricated by the mother and the two young children."

In his closing argument, counsel argued "[t]here was a motive for the mother and the two children to come up with this story." Specifically, K.R. "had some severe . . . medical problems at birth which she still has," and DCPP "was going to be working with the mother and the children to provide [K.R.] medical care . . . she could[ not] get up to now." Also, A.M. "had an immigration problem . . . and asked about a U Visa." "[A] person that has been a victim of domestic violence could qualify for [a] U Visa and that would now give her residency status in the United States." In addition, A.M. "asked about financial support, you know, rent, food stamps. Again, . . . she knew what she needed to do in order to get those services from the State."

Counsel argued the text messages allegedly sent by defendant could be explained as "spoofing where, you know, the number, the incoming number can be made to look like a number that they want it to look like." "So[,] anybody could have been . . . sending messages back and forth to the mother. Again, . . . a conspiracy between the mother and the children . . . to get to their

ultimate goal." Counsel argued the recordings were not verified using "a voice analysis to confirm that it was [defendant] that had this confrontation with the mother and the two children" and suggested the recordings "could have been staged[.]" Counsel also questioned the existence of the photographs and videos of the girls on his cell phone because the only evidence of them was A.M.'s testimony.

Before jury deliberations began, the State dismissed counts twelve, thirteen, and fourteen because the abuse of K.R. stopped before she turned thirteen. The jury found defendant guilty on all remaining counts. After appropriate mergers, the court sentenced defendant to consecutive terms of twenty-five years' imprisonment without the possibility of parole for first-degree aggravated sexual assault pursuant to the Jessica Lunsford Act, N.J.S.A. 2C:14-2(a)(1), on counts two and ten. The court imposed concurrent sentences on the remaining counts.

On appeal, defendant raises the following points for our consideration:

POINT I

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S SEVERANCE MOTION AND FAILING TO PROVIDE A LIMITING INSTRUCTION THAT THE SEPARATE CHARGES COULD NOT BE USED TO INFER PROPENSITY.

14

A.    Severance Was Required Because The Separate Charges Were Not Intrinsic To One Another, Were Not Relevant To A Material Issue in Dispute, And Any Possible Probative Value Of The Separate Charges Was Outweighed By The Undue Prejudice Of A Joint Trial.

1. The Separate Crimes Were Not Intrinsic To One Another.

2. The Separate Crimes Were Inadmissible At A Joint Trial Under N.J.R.E. 404(b).

B.    The Trial Court Committed Plain Error By Failing To Provide A Limiting Instruction That The Separate Charges Could Not Be Used To Infer Propensity.

POINT II

THE STATE INTRODUCED IRRELEVANT EVIDENCE THAT IMPROPERLY BOLSTERED THE CREDIBILITY OF ITS WITNESSES.

POINT III

THE JUDGMENT OF CONVICTION MUST BE AMENDED TO REMOVE THE RESTITUTION ORDER.

I.

A.

We are satisfied the court correctly denied defendant's motion to sever.

"The decision whether to grant severance rests within the trial court's sound

15

discretion and is entitled to great deference on appeal." State v. Brown, 118 N.J. 595, 603 (1990) (citing State v. Laws, 50 N.J. 159, 175 (1967)). We defer to the trial court's decision on a severance motion unless it constitutes an abuse of discretion. State v. Weaver, 219 N.J. 131, 149 (2014) (citing State v. Sanchez, 143 N.J. 273, 283 (1996)).

Rule 3:7-6 permits the State to charge multiple offenses in a single indictment "if the offenses charged are of the same or similar character or are based on the same act or transaction or on [two] or more acts or transactions connected together." "Although joinder is favored, economy and efficiency interests do not override a defendant's right to a fair trial." State v. Sterling, 215 N.J. 65, 72 (2013).

Rule 3:15-2(b) provides

> [i]f for any . . . reason it appears that a defendant . . . is prejudiced by a permissible or mandatory joinder of offenses . . . in an indictment . . . the court may order . . . separate trials of counts . . . or direct other appropriate relief.

"A court must assess whether prejudice is present, and its judgment is reviewed for an abuse of discretion." Sterling, 215 N.J. at 73.

"The test is whether the evidence from one offense would have been admissible N.J.R.E. 404(b) evidence in the trial of the other offense . . . ." Id.

16

at 98. "[S]ensitive admissibility rulings regarding other-crimes evidence made pursuant to [N.J.R.E.] 404(b) are reversed '[o]nly where there is a clear error of judgment.'" State v. Green, 236 N.J. 71, 81 (2018) (third alteration in original) (quoting State v. Rose, 206 N.J. 141, 157-58 (2011)). "If the evidence would be admissible at both trials, then the trial court may consolidate the charges because 'a defendant will not suffer any more prejudice in a joint trial than he would in separate trials.'" State v. Chenique-Puey, 145 N.J. 334, 341 (1996) (quoting State v. Coruzzi, 189 N.J. Super. 273, 299 (App. Div. 1983)).

N.J.R.E. 404(b)(1) to (2) provides, in pertinent part:

> [E]vidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition.
>
> This evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute.

To be admissible:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;

17

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[State v. Cofield, 127 N.J. 328, 338 (1992) (footnote omitted) (citing Abraham P. Ordover, Balancing the Presumptions of Guilt and Innocence: Rules 404(b), 608(b), and 609(a), 38 Emory L.J. 135, 160 (1989)).]

"The first prong requires that 'the evidence of the prior bad act, crime, or wrong . . . be relevant to a material issue that is genuinely disputed.'" State v. Willis, 225 N.J. 85, 98 (2016) (quoting State v. Covell, 157 N.J. 554, 564-65 (1999)). Stated differently, "[t]o avoid prejudicial joinder, the court must conclude . . . 'the evidence of other crimes or bad acts [is] relevant to prove a fact genuinely in dispute and the evidence is necessary as proof of the disputed issue.'" State v. Smith, 471 N.J. Super. 548, 567 (App. Div. 2022) (second alteration in original) (quoting Sterling, 215 N.J. at 73).

The fourth prong of the Cofield test "is generally the most difficult part of the test," and requires careful consideration. State v. Barden, 195 N.J. 375, 389 (2008). That prong "requires an inquiry distinct from the familiar balancing required under N.J.R.E. 403: the trial court must determine only whether the probative value of such evidence is outweighed by its potential for undue prejudice, not whether it is substantially outweighed by that potential." Green,

236 N.J. at 83-84 (internal citation and emphasis omitted). In performing that analysis, a court must consider whether the other-crimes evidence is necessary to prove the fact in dispute or whether other, less prejudicial evidence could be used to prove the same fact. Barden, 195 N.J. at 389 (citing State v. Jenkins, 178 N.J. 347, 365 (2004)). "All four of these factors must support the admission of the evidence in question." State v. J.M., 438 N.J. Super. 215, 221 (App. Div. 2014) (citing State v. P.S., 202 N.J. 232, 255 (2010)).

However, certain evidence of other wrongful conduct does not require analysis under N.J.R.E. 404(b). As set forth in State v. Rose, evidence which is intertwined with the other crime charged, provides a background to the events, or "completes the story," is intrinsic evidence. 206 N.J. at 181-82. If it is "intrinsic" evidence, it is admissible if relevant under N.J.R.E. 401 and 402, and not excludable under N.J.R.E. 403. Id. at 177-78. Intrinsic evidence is admitted "as 'necessary parts of the proof of an entire deed,' or as 'inseparable elements of the deed,' or as 'concomitant parts of the criminal act.'" Id. at 177 (quoting 1A Wigmore on Evidence § 218, at 1888 (Tillers rev. 1983)).

In denying defendant's motion to sever, the court thoroughly analyzed the proffered evidence as both background information admissible pursuant to Rose and Green and as evidence otherwise admissible pursuant to N.J.R.E. 404(b).

With respect to Cofield prong one, the court found evidence of the alleged abuse of both victims relevant for "non[-]propensity purposes" to show defendant's motive and intent. The court distinguished Smith and J.M. because "defendant does not merely deny that the sexual assault occurred." Rather, in one "recorded conversation he admits to sexually abusing V.L. and showing her pornography," and "[i]n a separate recorded conversation, he admits to recording both [victims] while they were in the bathroom. In both recordings, he denies that the misconduct was for his own pleasure but rather was done to protect both the girls."

The court additionally found the evidence was relevant to the motive or intent of the witnesses to rebut defendant's conspiracy allegations. "In asserting that the allegations are [a] conspiracy between V.L., K.R.[,] and [A.M.,] . . . defendant has put each person's motive at issue."

The court found the evidence was also admissible as necessary intrinsic background information. The court found "V.L. and K.R.'s disclosure of abuse to each other occurred simultaneously. V.L. tells K.R. that . . . defendant is touching her, resulting in K.R. saying . . . defendant is touching her, too." That "conversation also causes V.L. to be a fresh complaint witness to K.R.'s abuse. V.L. and K.R.'s disclosure to [A.M.] and [M.G.] is fundamentally a joint effort."

A-0763-22

After that, "the family jointly decides when and how to confront defendant about both girls' allegations. K.R. is a witness to at least one act of sexual abuse between defendant and V.L. K.R. was experiencing . . . similar touching by defendant and her testimony is conceptualized in that fashion." "Both girls [were] present for the recorded confrontation with defendant and participate[d] in that confrontation. Both girls were subject to invasions of privacy by defendant's installation of a recording device in the bathroom."

The court found prong two was satisfied because the abuse was happening during the same time-period at the same locations. Prong three was satisfied because V.L. and K.R. testified to their own abuse, they were both fresh complaint witnesses for the other, and defendant admitted "to recording V.L. and K.R. in the bathroom, the sexual abuse of V.L.[,] and showing pornography to V.L."

The court found the State satisfied prong four, that the probative value of the evidence was not outweighed by its apparent prejudice. It found, "there is no other less inflammatory material that would be equally probative to prove defendant's motive, provide necessary background information needed to understand the evidence, and to assist the jury in assessing . . . defendant's theory that the victims and [their] mother conspired to fabricate the assaults."

A-0763-22

We are satisfied the court appropriately exercised its discretion by determining evidence of the joined offenses was admissible as intrinsic background information and in accordance with N.J.R.E. 404(b). As the court found, the alleged offenses were inextricably intertwined. For example, defendant surreptitiously recorded both girls naked in the bathroom and stored images of them on his phone. He then claimed the images were not for his sexual gratification. Evidence that he took and retained images of both girls was relevant to demonstrate his actual motive. Moreover, when he admitted to hiding the camera and storing the images, he referred collectively to both victims. In addition, on at least two occasions, K.R. was in the same room and witnessed defendant sexually abusing V.L.

As the court noted, the evidence was also bound together by the fresh complaint witnesses and the facts and circumstances of the victims' simultaneous disclosure to A.M. and M.G. Evidence of the alleged abuse of K.R. tended to show defendant's claims that V.L. initiated the touching and watched pornography on her own were not true. Likewise, the abuse of V.L. tended to show his claim K.R. "misunderstood" when he touched her accidentally was not credible. It also tended to demonstrate defendant's common plan or scheme to desensitize the girls to his sexual abuse by exposing them to

22

pornographic material and convincing them to engage in the same conduct they saw.

The court correctly found the evidence was relevant to rebut defendant's claim the victims and A.M. conspired to make false allegations of abuse, create fabricated recordings purporting to contain admissions of wrongdoing by defendant, and send false text messages from his phone apologizing for his conduct. The State was properly permitted to use the separate allegations of sexual abuse and invasion of privacy by V.L. and K.R. to rebut defendant's conspiracy and fabrication claims.

Defendant's reliance on Smith is not persuasive. In Smith, the defendant denied any sexual contact with the victim. 471 N.J. Super. at 569. We therefore concluded "defendant's intent in rubbing [the victim's] vaginal area, or that it did not occur by mistake, was never an issue." Id. at 570. Here, defendant admitted taking naked images of the girls but claimed it was not for his sexual gratification, claimed K.R.'s allegations were caused by a misunderstanding, contended V.L. initiated the sexual abuse, and claimed the allegations were the product of a conspiracy supported by fabricated evidence.

The court's determination the evidence would have been admissible in separate trials and defendant would not suffer any more prejudice in a joint trial

than he would in separate trials was amply supported by the record and was not a clear error of judgment. We see no basis to disturb the court's decision to deny the motion to sever.

B.

We are satisfied it was not plain error to omit a N.J.R.E. 404(b) limiting instruction under the facts of this case. Counsel did not object to the jury charge. If a defendant does not object when a charge is given, "there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case." State v. Montalvo, 229 N.J. 300, 320 (2017). When there is no objection, we review for plain error and "disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" State v. Funderburg, 225 N.J. 66, 79 (2016) (quoting R. 2:10-2); see State v. Adams, 194 N.J. 186, 206-07 (2008) ("Generally, a defendant waives the right to contest an instruction on appeal if he does not object to the instructions as required by Rule 1:7-2.").

Plain error in a jury charge is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."

24

State v. Camacho, 218 N.J. 533, 554 (2014) (alteration in original).  In reviewing a jury charge, "[t]he charge must be read as a whole in determining whether there was any error."  State v. Torres, 183 N.J. 554, 564 (2005) (citing State v. Jordan, 147 N.J. 409, 422 (1997)).  In addition, the error "must be evaluated in light 'of the overall strength of the State's case.'"  State v. Walker, 203 N.J. 73, 90 (2010) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)).

Importantly, there is no requirement that a N.J.R.E. 404(b) limiting instruction "be given when two different sets of charges are tried together."  Smith, 471 N.J. Super. at 577.  That is particularly true when, as in this case, evidence of the different charges is relevant and admitted as intrinsic background information.

Even so, the judge properly instructed the jury:

> There are [thirteen] offenses charged in the indictment.  They are separate offenses by separate counts in the indictment.  In your determination of whether the State has proven . . . defendant guilty of the crimes charged in the indictment beyond a reasonable doubt, . . . defendant is entitled to have each count considered separately by the evidence which is relevant and material to that particular charge based on the law as [the court] will give it to you.

Considering the charge as a whole, we are satisfied there was no error, much less an error that possessed a clear capacity to bring about an unjust result.

A-0763-22

We are unconvinced by defendant's claim the court committed plain error by allowing evidence of: (1) A.M.'s domestic violence history with prior partners; (2) K.R.'s medical condition; (3) A.M.'s financial difficulties; and (4) V.L.'s allegations of sexual abuse by A.M.'s prior boyfriend. These arguments are raised for the first time on appeal.

"We apply a deferential standard of review to the trial judge's evidential rulings." Smith, 471 N.J. Super. at 568. When an appealing party fails to object to an evidentiary ruling at trial, we review it under the plain-error standard. State v. Singh, 245 N.J. 1, 13 (2021) (citing R. 2:10-2). Plain error is one "clearly capable of producing an unjust result." Ibid. (quoting R. 2:10-2). The "error will be disregarded unless a reasonable doubt has been raised whether the jury came to a result that it otherwise might not have reached." Ibid. (quoting State v. R.K., 220 N.J. 444, 456 (2015)).

K.R.'s medical condition was relevant because it was mentioned in the May 2019 recorded conversation, and defendant cited it during that conversation as the reason he did not sexually abuse K.R. Defendant also relied on K.R.'s medical condition as evidence of A.M.'s motive to fabricate the claims against him to secure needed medical care for K.R. The cause of her birth defects was

referenced when describing her condition. There was no suggestion defendant was involved in any way.

Evidence of A.M.'s financial difficulties and prior domestic abuse was relevant to address defendant's conspiracy claims. Counsel argued in his opening and closing A.M. and the victims conspired to falsely accuse defendant to obtain financial assistance and a U Visa for A.M. In fact, A.M.'s inquiry about a U Visa was raised for the first time by defense counsel on cross-examination of A.M. and was invited error. See State v. A.R., 213 N.J. 542, 561 (2013) (trial errors induced by defense counsel ordinarily are not a basis for reversal on appeal).

Evidence V.L. was abused by A.M.'s prior boyfriend also did not implicate defendant or prejudice him in any way. To the contrary, counsel attempted to use V.L.'s prior allegations of abuse to impeach her credibility during his closing argument.

We do not discern any basis to find the court erred by admitting the evidence at issue. Even if it did, there is no basis to find plain error.

### III.

The parties agree the sentencing judge denied the State's request for restitution to the Victims of Crime Compensation Office based on defendant's

inability to pay. Nevertheless, restitution in the amount of $8,419.34 was inadvertently included on the judgment of conviction. We remand for entry of an amended judgment of conviction without the restitution award.

To the extent we have not addressed any remaining arguments, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed in part and remanded in part for correction of the judgment of conviction in accordance with this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0763-22